**TICOR TITLE INSURANCE COMPANY, a California corporation, Plaintiff,**

v.

**UNIVERSITY CREEK, INC., a Florida corporation, and Creek Plaza, Inc., a Florida corporation, d/b/a University Creek Associates, a joint venture, Defendants.**

No. 88–1142–CIV–T–13B.

United States District Court,
M.D. Florida,
Tampa Division.

June 19, 1991.

Ralph P. Mangione, Taub & Williams, Tampa, Fla., for plaintiff.

Mark P. Buell, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., for defendants.

## MEMORANDUM AND ORDER

JAMES HARVEY, Senior District Judge.

This is a diversity case in which plaintiff Ticor Title Insurance Company (Ticor) seeks a declaration that it is not liable under a title insurance policy to defendants University Creek, Inc. and Creek Plaza, Inc., d/b/a University Creek Associates (collectively: University Creek), and that it did not violate the Florida Unfair Insurance Trade Practices Act, Fla.Stat. § 626.9541(1)(i)(3)(c), (f). University Creek asserts a three-count counterclaim. In Count I, University Creek seeks damages for Ticor's alleged breach of the title insurance policy. In Count II, it seeks damages under section 624.155(1)(b)(1) of the Florida statutes for Ticor's alleged failure to settle in good faith a claim made under the policy. Finally, in Count III, it seeks damages for Ticor's alleged negligence in performing its duties under the policy.

The Court tried this case without a jury. After considering the pleadings, the testimony of the witnesses, the documents in evidence, and the arguments of the parties, the Court makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52.

### I. FINDINGS OF FACT [1]

1. Ticor is a California corporation engaged in the title insurance business.

2. Two Florida corporations, University Creek, Inc. and Creek Plaza, Inc. formed a

---

1. If any finding of fact is determined to be a conclusion of law, it shall be so treated, notwithstanding its inclusion here as a finding of fact.

Florida joint venture named University Creek Associates.

3. Julian Marx, the president and sole shareholder of MacMarx Properties, Inc. (MacMarx), is a real estate developer.

4. On December 16, 1983, Marx signed a purchase and sale agreement on behalf of MacMarx, in which MacMarx agreed to buy from the estate of Joseph Wolf the real property at issue in this case. Marx planned to develop a shopping center on the property.

5. During 1984, Marx and G. Gregory Giagnocavo, the president of both Southern Capital Group, Inc. (Southern) and defendant Creek Plaza, Inc., entered negotiations which ultimately resulted in the transfer of MacMarx's rights in the property to University Creek on February 1, 1985.

6. Roger Goldman, a member of the Katz, Barron, Squitero & Faust law firm and an issuing agent of Ticor, represented MacMarx during the negotiations.

7. On September 14, 1984, Giagnocavo recorded in the public records of Broward County, Florida an affidavit claiming an interest in the property on behalf of Southern.

8. In November, 1984, Goldman insisted that Giagnocavo remove the affidavit from the public records because he did not want it to appear in the chain of title and because he feared that it might cause problems with the seller, the estate of Joseph Wolf.

9. On February 1, 1985, both Southern and MacMarx assigned their interests in the purchase and sale agreement to University Creek. In addition, MacMarx assigned its interest in the shopping center project to University Creek.

10. The interest in the shopping center project which MacMarx assigned to University Creek included an option agreement which Burger King Corporation (Burger King) had entered with MacMarx on September 28, 1984 for the purchase of an outparcel of the property.

11. On the same day that Southern and MacMarx transferred their interests in the purchase and sale agreement to University Creek, University Creek obtained title to the property from the estate of Joseph Wolf.

12. In connection with the purchase and sale of the property, Ticor issued to University Creek a title insurance policy in the amount of $3,500,000.

13. At the time Ticor issued the policy, it knew that University Creek planned to build a shopping center on the property. Further, it knew about the option agreement which MacMarx had entered with Burger King and then assigned to University Creek, because the exceptions section of the policy included that agreement.

14. Ticor's policy promised to insure against "loss or damage ... and costs, attorneys' fees and expenses ... sustained or incurred by the insured by reason of ... [a]ny defect in or lien or encumbrance on such title."

15. The policy fails to define the words "defect," "lien," or "encumbrance."

16. Paragraph 3(b)(ii) of the policy reads as follows:

The insured shall notify the Company promptly in writing ... in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy.

17. Paragraph 3(c) of the policy reads as follows:

The Company shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured, and the Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy.

18. Paragraph 6(a)(i) of the policy states that "[t]he liability of the Company under this policy shall in no case exceed ... the actual loss of the insured claimant...."

19. Paragraph 7 reads, in part, as follows:

No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, as insured, within a reasonable time after receipt of such notice.... or (c) for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.

20. Ticor recorded the title documents at 3:25 p.m. on February 5, 1985. The policy became effective at that time.

21. Ticor did not record the title documents in a timely manner. Although the parties to the transaction closed the sale on Friday, February 1, 1985, Ticor failed to record the title documents until Tuesday, February 5, 1985. Ticor fails to explain why it did not record the documents earlier.

22. At 2:52 p.m. on February 5, 1985, thirty-three minutes before Ticor recorded the title documents, David Shubow recorded an affidavit in the public records of Broward County, Florida, in which he and members of his family (the Shubows) claimed an interest in the property. The Shubows noted in the affidavit that they had invested money with Marx, MacMarx, and other entities based on promises that those entities owned an interest in the property, or that they would soon own an interest in the property. The Shubows "claim[ed] ownership to any legal and/or equitable interest owned by [Marx, Mac-Marx, and the other entities], in relation to the PROPERTY."

23. On February 12, 1985, the Shubows filed a complaint against Marx, MacMarx, and others in a Florida state court. The Shubows alleged in their complaint that under a contract they had entered with Marx they had become co-owners with Marx of an interest in the purchase and sale agreement relating to the property. In Count VII of their complaint, the Shubows asked the Florida state court to impose a constructive trust on the assets of Marx, MacMarx, and the others, and to order those assets conveyed to the Shubows.

24. On the same day the Shubows filed their complaint, they recorded in the public records of Broward County, Florida a notice of *lis pendens* indicating that their lawsuit might affect title to the property.

25. On February 25, 1985, Goldman, Ticor's issuing agent, discovered the Shubows' notice of *lis pendens* while making a routine title update.

26. Goldman contacted John Thornton, vice-president and senior title counsel for Ticor, on February 27, 1985 to tell him about the Shubow lawsuit.

27. University Creek filed a motion to intervene in the Shubow lawsuit on March 18, 1985.

28. The certificate of service states that University Creek mailed to Goldman a copy of its motion to intervene.

29. On March 20, 1985, Victor Rones, an attorney representing University Creek, advised Ticor "in accordance with your Title Insurance Policy of a claim of title or interest adverse to the title in the Estate insured by your Company." Rones enclosed a copy of the Shubow affidavit.

30. In a letter dated March 27, 1985, Goldman advised Thornton of the Shubow affidavit. Moreover, he noted that the Shubows had recorded the affidavit before Ticor recorded the title documents.

31. On April 3, 1985, Ticor wrote to University Creek's lawyer, Rones, to advise Rones that it had received University Creek's claim and that it had referred the claim to Robert W. Gericke, vice-president and senior associate title counsel for Ticor.

32. Gericke wrote to Rones on April 11, 1985, advising him that Ticor had begun to investigate University Creek's claim.

33. On the same day he wrote to Rones, Gericke also wrote to Michael Katz, Goldman's law partner, regarding University Creek's claim. He noted in his letter that it appeared that the Shubows' affidavit did not affect University Creek's interest in the property. Nevertheless, he stated that he

would need more information before he could deny the claim. Moreover, he reminded Katz that Ticor had to respond to the claim letter as soon as possible to avoid possible additional liability.

34. In a handwritten note dated April 13, 1985, Gericke advised Thornton that he "would guess that we have no liability other than defense fees because the affidavit would appear to be outside the chain of title."

35. On April 24, 1985, Thornton wrote to Rones to obtain information regarding the details of University Creek's purchase of the property.

36. At the time Thornton wrote to Rones, he had already concluded that Ticor would deny University Creek's claim. He merely wished to obtain more detailed information.

37. On April 29, 1985, Goldman wrote to Marx's attorney in the Shubows' lawsuit, William E. Blyler, advising him that Thornton would contact him from time to time to monitor the lawsuit's status.

38. Rones wrote to Thornton on April 30, 1985. He indicated that even though it appeared from Thornton's April 24, 1985 letter that Thornton knew the facts surrounding University Creek's purchase of the property, he would like Thornton to come to his office so that Rones could explain the transaction as they reviewed the documents together.

39. Thornton responded to Rones' letter on May 13, 1985. He told Rones that he planned to visit Rones' office before the end of the month to review documents related to the transaction.

40. Sometime before May 17, 1985, the Florida state court in which the Shubows had filed their complaint allowed University Creek to intervene.

41. On June 24, 1985, University Creek filed a motion in the Shubows' lawsuit asking the court to discharge the notice of *lis pendens* which the Shubows had recorded.

42. Because Thornton had never come to Rones' office to review the transaction documents as he had promised, Rones wrote to Thornton on July 12, 1985, again

asking him to schedule an appointment to review the transaction documents. Further, after briefly discussing the progress of the Shubows' lawsuit, Rones requested Thornton to "[p]lease kindly advise me as to what the Title Insurance Company's decision is on this matter as my client's legal bill are [sic] now in excess of $5,000.00 in litigating this matter."

43. Thornton responded to Rones' letter on July 25, 1985. In his letter, Thornton noted that he would continue to monitor the Shubows' lawsuit through Blyler, Marx's lawyer in that case, but that he saw no reason to review the transaction documents in the following three or four weeks. He wrote that if "our efforts to bring the matter to a successful conclusion prior to the first of September are unsuccessful I will most assuredly be down to review your files."

44. In response to Thornton's letter, Rones wrote to Thornton on July 29, 1985. After acknowledging Thornton's July 25, 1985 letter, Rones said that he "look[ed] forward to meeting with [Thornton] to discuss several problems in this matter that still remain."

45. Several times after September 28, 1984, the date that Burger King had entered the option agreement with MacMarx which MacMarx had later assigned to University Creek, Burger King obtained extensions of its option to buy from University Creek an outparcel of the property. The parties planned to close the sale during the fall of 1985.

46. On September 4, 1985, Lawyers Title Insurance Company (Lawyers Title) issued to Burger King a title insurance commitment in connection with the sale of the outparcel.

47. Lawyers Title's title insurance commitment to Burger King excepted from coverage the Shubows' affidavit and *lis pendens.*

48. In a letter dated October 24, 1985, Burger King's in-house lawyer, Vincent O'Reilly, asked Goldman, Ticor's issuing agent, whether Ticor would issue a title insurance policy providing "positive insur-

ance" over the Shubows' affidavit and *lis pendens*. After referencing an October 22, 1985 conversation with Goldman, O'Reilly noted that he "would have preferred to keep the [Lawyers Title] insurance if Ticor had agreed to indemnify [Lawyers Title] for [the Shubows' affidavit and *lis pendens*]."

49. Although Ticor had refused to indemnify Lawyers Title, Goldman sent to O'Reilly on October 31, 1985 a title insurance commitment in response to O'Reilly's October 24, 1985 letter.

50. Ticor's title insurance commitment to Burger King did not except from coverage the Shubows' affidavit and *lis pendens*.

51. Although Ticor had offered to insure over the Shubows' affidavit and *lis pendens*, Burger King chose not to obtain the offered insurance. Instead, O'Reilly insisted that University Creek remove the affidavit and *lis pendens* before Burger King exercised its option to buy the outparcel, because he feared that Burger King might incur substantial expenses if forced to make a claim under a title insurance policy.

52. On November 6, 1985, the Florida state court in which the Shubows had filed their lawsuit denied without prejudice University Creek's emergency motion to declare the property free of the Shubows' affidavit and *lis pendens*. The court had never ruled on University Creek's June 24, 1985 motion seeking the same relief.

53. Immediately after the state court denied University Creek's emergency motion, Bradford J. Webb, an officer and in-house counsel for University Creek, contacted Gericke, a vice-president and senior associate title counsel for Ticor. Webb asked Gericke whether Ticor would pay $200,000 to the Shubows to settle their claims against the property. Gericke told Webb that Ticor would not pay anything because it did not consider the Shubows' claims to the property valid. Moreover, he said that Ticor would not participate in the settlement negotiations.

54. In a handwritten note to Thornton dated November 6, 1985, Gericke noted that he did not believe that Ticor had ever admitted or denied liability. He wrote that "[a]ll you have ever said was that you were monitoring this action and that if it was not successfully concluded by September 1st, you would make a trip to Miami to review the files of Victor Rones."

55. Later on November 6, 1985, Webb sent Ticor a telegram demanding that Ticor pay $150,000 to University Creek to settle the Shubows' claim to the property.

56. On November 7, 1985, Thornton wrote to Webb to deny on Ticor's behalf University Creek's claim. He wrote: "As I have previously advised your attorney [Webb], we conclude your interest as insured by our policy cannot be adversely affected by the Shubow lawsuit, and both the affidavit of February 5, 1985, and the Lis Pendens of February 12, 1985 are 'wild' instruments, not within your chain of title."

57. Under the circumstances surrounding this case, Ticor took an unreasonable amount of time to respond to University Creek's claim. Even though Ticor knew that University Creek planned to build a shopping center and wished to sell to Burger King in the fall of 1985 an outparcel on the property, Ticor failed to advise University Creek of its position regarding coverage for over seven months.

58. On November 8, 1985, University Creek entered a settlement agreement with the Shubows. The agreement provided that University Creek would pay the Shubows $150,000 for quit claim deeds which would release the Shubows' claims against the property.

59. On behalf of University Creek, Rones gave notice on December 16, 1985 to Ticor and the Florida Insurance Commission of University Creek's intent to file a lawsuit under section 624.155 of the Florida statutes.

60. On February 13, 1986, Ticor's counsel responded to Rones letter. Ticor's counsel wrote that *"[i]t is TICOR's position that your clients are not entitled to coverage under the subject policy."* (Emphasis in original).

61. On May 5, 1986, University Creek paid the Shubows $150,000 as they had promised in their settlement agreement.

## II. CONCLUSIONS OF LAW [2]

1. The Court has jurisdiction over the parties and the subject matter of this lawsuit.

2. The Court must apply the substantive law of Florida. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945 (11th Cir.1982).

3. In the absence of authority from the Supreme Court of Florida, this Court "must adhere to the decisions of [Florida]'s intermediate appellate courts unless there is some persuasive indication that the state's highest court would decide the issue otherwise." *Flintkote Co.*, 678 F.2d at 945.

### A. *Ticor's Claim for Declaration of No Liability and Count I of University Creek's Counterclaim*

4. Both Ticor's claim for a declaration of no liability under the policy and University Creek's claim for damages for breach of the policy (Count I) involve the same issues. Accordingly, the Court will address those claims together.

i. Defect, Lien, or Encumbrance

5. Ticor argues that the Shubows' affidavit and *lis pendens* did not constitute a defect, lien, or encumbrance against which the policy insured University Creek. University argues that the Shubows' affidavit and *lis pendens* was either a defect or an encumbrance.

6. Florida courts construe broadly an insurance policy's coverage provisions, while construing narrowly a policy's exclusions. *Cochran v. State Farm Mut. Auto. Ins. Co.*, 298 So.2d 173, 174 (Fla.Dist.Ct. App.1974).

■ 7. Because Ticor failed to define the words "defect," "lien," or "encumbrance," the Court construes those words broadly in favor of coverage. *See id.*

8. Moreover, "[w]hen a[n] [insurance] policy provision remains undefined, common everyday usage determines its meaning." *Security Ins. Co. v. Commercial Credit Equip. Corp.*, 399 So.2d 31, 34 (Fla. Dist.Ct.App.1981).

9. Websters New Collegiate Dictionary (1975) defines the word "encumbrance" as "a claim ... against property." Hence, a common meaning of the word "encumbrance" is a claim against property.

■ 10. Both the affidavit and the *lis pendens* filed by the Shubows indicated that the Shubows claimed an interest in the property. The affidavit, which the Shubows filed before Ticor recorded University Creek's title documents, "claim[ed] ownership to any legal and/or equitable interest owned by [Marx, MacMarx, and the other entities], in relation to the PROPERTY." In addition, the notice of *lis pendens* recorded in the public records indicated that the Shubows' lawsuit against Marx, Mac-Marx, and others might affect title to the property.

Further, under Florida law, "[t]he purpose of a notice of lis pendens is to warn all persons that the title to property is in litigation and that they are in danger of being bound by an adverse judgment." *Ross v. Breder*, 528 So.2d 64, 65 (Fla.Dist.Ct.App. 1988); *see also American Legion Community Club v. Diamond*, 561 So.2d 268, 269 n. 2 (Fla.1990) (quoting *Berkley Multi– Units, Inc. v. Linder*, 464 So.2d 1356, 1357 (Fla.Dist.Ct.App.1985)) (" 'The purpose of a notice of lis pendens is to alert creditors, prospective purchasers and others to the fact that the title to a particular piece of real property is involved in litigation' ").

Thus, the Court holds that the affidavit and *lis pendens* constitute an encumbrance under Florida law.

11. Ticor argues that the affidavit and *lis pendens* cannot constitute an encumbrance because the Shubows did not seek title to the property in their claim against Marx, MacMarx, and others. The Court does not find Ticor's argument persuasive.

---

**2.** If any conclusion of law is later determined to be a finding of fact, it shall be so characterized, notwithstanding its inclusion here as a conclusion of law.

In Count VII of the Shubows' complaint, they asked the Florida state court to impose a constructive trust on the assets of Marx, MacMarx, and others, and to order those assets conveyed to the Shubows. Section 160 of the Restatement of Restitution states that "[w]here a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." Restatement of Restitution § 160 (1937). Further, comment g to section 160 states that "[w]here property is held by one person upon a constructive trust for another, and the former transfers property to a third person who is not a bona fide purchaser, the interest of the beneficiary is not cut off." Restatement of Restitution § 160 comment g (1937). Finally, comment h to section 160 notes that "[w]here property is held by one person upon a constructive trust for another, and the constructive trustee by the wrongful disposition of the property acquires other property, he holds the property so acquired upon a constructive trust...." Restatement of Restitution § 160 comment h (1937).

Without deciding whether the Shubows would have been successful on Count VII of their complaint, the Court notes that MacMarx's assets included an interest in the purchase and sale agreement, in which MacMarx agreed to buy from the estate of Joseph Wolf the property at issue in this case. Although MacMarx assigned its interest in the purchase and sale agreement to University Creek on February 1, 1985, the Shubows recorded their affidavit before Ticor recorded the title documents. Moreover, the Court possesses no evidence with which to answer the question whether University Creek was a *bona fide* purchaser. If the court in the Shubows' lawsuit had found that University Creek was not a *bona fide* purchaser, the court may also have ruled that University Creek held the property upon a constructive trust for the Shubows. *See* Restatement of Restitution § 160 comments g & h (1937). In addition, the Court notes that the court in the Shubows' lawsuit refused to discharge the *lis*

*pendens* even though University Creek twice asked the court to do so. Hence, the Court holds that the Shubows claimed an interest in the property, as indicated by the affidavit and *lis pendens*.

Thus, as noted, the affidavit and *lis pendens* constitute an encumbrance covered by the policy. Therefore, the policy insured University Creek against any loss or damage, including attorneys' fees and expenses, sustained because of the Shubows' affidavit and *lis pendens*.

### ii. Voluntary Payment

■ 12. Ticor argues that University Creek did not suffer an actual loss because the policy does not insure against the presence of an encumbrance, but rather, against loss sustained as a result of the encumbrance. Ticor asserts that the only loss sustained by University Creek was voluntarily assumed, without the prior written consent of Ticor. Because paragraph 7 of the policy states that no claim shall arise "for liability voluntarily assumed by [University Creek] in settling any claim or suit without prior written consent of [Ticor]," Ticor says that University Creek is barred from recovering under the policy.

University Creek argues that Florida law does not require an insured to wait for damage to occur when a title insurer refuses to act on the insured's claim. University Creek says that Ticor's refusal to act permitted University Creek to settle the Shubows' claim to the property without Ticor's prior written consent.

13. In *Endruschat v. American Title Insurance Co.*, 377 So.2d 738 (Fla.Dist.Ct. App.1979), the court held that an insured who incurs expenses in quieting title, after its title insurer improperly denies coverage, may recover those expenses from the title insurer even though no one seeks to enforce restrictions on the title. Two dentists contracted to buy property, on which they planned to build a clinic. A title insurance company issued the dentists a policy, insuring them against loss resulting from any defect in the title, or any lien or encumbrance on it. The bank which loaned the dentists money to begin construction later

discovered recorded restrictions limiting the use of the property to single family housing. The bank suspended loan disbursements and construction came to a halt. After the title insurer denied coverage under the policy, the dentists hired their own attorneys and successfully quieted title nine months later. The dentists then filed suit to recover their expenses in quieting title and the increased construction costs caused by the delay.

In response to the title insurer's argument that the dentists had not suffered an actual loss, but had voluntarily set out to remove the restrictions, the court noted that the title insurer's argument would "require ... the dentists to ignore duly recorded restrictions and play Russian Roulette with the surrounding property owners to see whether they [would] legally enforce the restrictions." 377 So.2d at 742. Hence, the court held that the dentists could properly recover the expenses they incurred in quieting title.

Similarly, Ticor's argument would require University Creek to ignore the Shubows' recorded affidavit and *lis pendens*, and to gamble that the state court would not find that University Creek held the property upon a constructive trust for the Shubows. Even though University Creek settled the Shubows' claim to the property merely so that it could sell an outparcel to Burger King, Ticor had insured that it would indemnify University Creek for any loss resulting from an encumbrance on the title. University Creek could not have sold the outparcel if the Shubows' claim remained. Hence, under *Endruschat*, University Creek suffered a loss covered by the policy.

■ 14. Further, the Court holds that Ticor's refusal to deny University Creek's claim until November 7, 1985, or to take any action before that time, permitted University Creek to settle the Shubows' claim to the property without Ticor's prior written consent. *See Endruschat*, 377 So.2d at 742; *see also Shada v. Title & Trust Co.*, 457 So.2d 553, 556 (Fla.Dist.Ct.App.1984) (where title insurer refused to act to remove defects in title, and insured then in-

curred expenses in quieting title, court held that title insurer "had a duty under its contract to cure the defects and its failure to do so entitles [the insured] to damages"); *cf. Cunningham v. Austin Ford, Inc.*, 189 So.2d 661, 666 (Fla.Dist.Ct.App.1966) ("It is generally held that if an insurer without right refuses to defend, the insured is entitled to make a reasonable settlement and is not required to allow the suit to be carried to judgment, even though the policy purports to avoid liability for a settlement made without insurer's consent").

University Creek gave Ticor notice of its claim on March 20, 1985, over seven months before Ticor advised University Creek that it would deny the claim. Even though Ticor knew that University Creek planned to close the sale to Burger King of an outparcel of the property in the fall of 1985, it left University Creek to fend for itself. Ticor's refusal either to deny promptly University Creek's claim or to help University Creek to quiet title, precludes Ticor from successfully asserting as a defense University Creek's failure to obtain prior written consent to the settlement with the Shubows.

### iii. Duty to Quiet Title

■ 15. Ticor also argues that it had no duty to take affirmative action to remove the Shubows' affidavit and *lis pendens*. It notes that the policy requires it to defend suits brought against University Creek, and gives it the option to prosecute any action "necessary or desirable to establish title to the estate or interests as insured," but does not require it to bring suit.

In response, University Creek concedes that the policy does not specifically state that Ticor had a duty to bring suit to quiet title, but argues that the policy "contemplate[s] that Ticor will take seasonable action when notified of a claim by its insured." It asserts that Ticor's complete failure to take any action or to advise University Creek of its position regarding University Creek's claim constitutes a breach of Ticor's implied duties under the policy.

16. Paragraph 7 of the policy reads, in part, as follows:

No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, as insured, within a reasonable time after receipt of such notice....

Paragraph 7 contemplates that Ticor will take some action to remove an encumbrance within a reasonable time after receiving notice of it. Yet, Ticor took no action whatsoever. Indeed, Ticor failed even to deny the claim until over seven months had passed and University Creek found itself quieting title on its own behalf.

■ Accordingly, the Court holds that Ticor breached an implied contractual duty to take some affirmative action to remove the Shubows' affidavit and *lis pendens.* Further, the Court finds Ticor's breach of the policy so total and fundamental as to prevent it from arguing that it had no duty to take any affirmative action. *See Shada,* 457 So.2d at 556 (title insurer that refused to act to remove defects in title breached its contractual duty, because insured under a title insurance policy buys insurance to protect against such defects).

iv. University Creek's Intervention

■ 17. Ticor also asserts that University Creek's intervention in the Shubows' lawsuit prejudiced Ticor because the Shubows had neither named University Creek nor served it with a complaint seeking relief against it or its title to the property.

University Creek responds that its intervention did not prejudice Ticor because Ticor knew that it had intervened, yet chose neither to participate in that action nor to help in any way to resolve the Shubows' claim to the property. Further, University Creek says that Ticor forfeited any right it had to complain about University Creek's eventual settlement with the Shubows because it failed to take any action to protect University Creek's interests.

18. The Court does not find Ticor's argument persuasive. The Court fails to see how University Creek's intervention in the Shubows' lawsuit prejudiced Ticor. Whether University Creek had intervened in the Shubows' lawsuit or not, University Creek would have had to pay the Shubows to release their claims to the property, because Burger King would not have agreed to buy the outparcel unless University Creek promptly removed the Shubows' affidavit and *lis pendens.*

■ Further, Ticor's complete failure to give its insured any guidance with regard to the Shubows' claim to the property precludes Ticor from complaining that its insured attempted to clear the title of the encumbrance. After learning of the Shubows' claimed interest in the property, University Creek moved to intervene in the Shubows' lawsuit so that it could quiet title, and promptly gave notice to Ticor of the Shubows' claim. Yet, Ticor never advised University Creek to withdraw from the Shubows' lawsuit, never offered to help with it, and never took any action to remove the encumbrance. In addition, Ticor neglected to tell University Creek before November 7, 1985 that it believed the Shubows' had no valid claim to the property, even though Thornton had concluded by April of 1985 or earlier that Ticor would deny the claim. By that time, Burger King had already threatened not to buy the outparcel from University Creek unless University Creek somehow removed the Shubows' affidavit and *lis pendens.*

v. Conclusion

19. In conclusion, the Court finds against Ticor on its claim for a declaration of no liability under its policy, and finds for University Creek on Count I of its counterclaim.

20. The Court holds that University Creek is entitled to recover $150,000, the amount it paid to the Shubows to release their claims to the property.

21. The Court also holds that University Creek is entitled to prejudgment interest in the amount of $92,219.40, calculated at the rate of twelve percent per annum from May 6, 1986, the day after it paid the Shubows, until the date of this order, June

19, 1991. *See Farrell v. Ashmore*, 507 So.2d 691 (1987); Fla.Stat. § 687.01.

22. In addition, the Court holds that University Creek is entitled under its policy to recover costs and attorneys' fees. *See* Finding of Fact 14. Accordingly, the Court will reserve jurisdiction to determine the amount of University Creek's attorneys' fees and costs upon further submissions of the parties, if they cannot stipulate to those amounts.

### B. Ticor's Claim for Declaration that It Did Not Violate the Florida Unfair Insurance Trade Practices Act

■ 23. Under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Ticor asks the Court to declare that it did not violate the Florida Unfair Insurance Trade Practices Act (the Act), Fla.Stat. § 626.9541(1)(i)(3)(c), (f). The Act defines the following as unfair or deceptive acts or practices:

3. Committing or performing with such frequency as to indicate a general business practice any of the following:

. . . . .

c. Failing to acknowledge and act promptly upon communications with respect to claims;

. . . . .

f. Failing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement.

24. The Court holds that it does not have subject matter jurisdiction over this claim because Ticor presents no justiciable controversy. With regard to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Supreme Court stated in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient

immediacy and reality to warrant the issuance of a declaratory judgment."

The Court finds that the parties do not present a justiciable controversy under Fla. Stat. § 626.9541(1)(i)(3)(c), (f). University Creek does not allege that Ticor, with such frequency as to indicate a general business practice, fails to act promptly on communications with respect to claims, or fails promptly to provide explanations for denying claims. University Creek merely contends that Ticor failed to act promptly with regard to its own claim. Hence, the parties have no adverse legal interests with regard to Fla.Stat. § 626.9541(1)(i)(3)(c), (f).

### C. University Creek's Remaining Counterclaims

i. Count II—Section 624.155(1) Claims

25. University Creek seeks in Count II of its counterclaim to recover damages under section 624.155(1)(b)(1) of the Florida statutes for Ticor's alleged failure to settle in good faith a claim made under the policy. Section 624.155(1)(b)(1) provides for a civil remedy when an insurer damages an insured by "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests."

26. Although University Creek cites section 624.155(1)(b)(1) in its complaint, both its pleadings and its proposed conclusions of law show that it also seeks to recover under section 624.155(1)(a)(1), which provides a civil remedy for violations of section 626.9541(1)(i) without proof that the insurer committed unfair or deceptive acts with such frequency as to constitute a general business practice. Specifically, University Creek seeks to recover damages under section 624.155(1)(a)(1) because Ticor allegedly violated section 626.-9541(1)(i)(3)(c), (f). *See supra* Conclusion of Law 23. Accordingly, the Court will treat University Creek's proposed conclusions of law as a motion to amend the pleadings to conform to the evidence, and will grant the motion.

27. Section 624.155(1)(b)(4) reads as follows:

(4) No punitive damages shall be awarded under this section unless the acts giving rise to the violation occur with such frequency as to indicate a general business practice....

■ 28. Because the Court holds that University Creek is entitled to compensatory damages under Count I of its counterclaim, the Court will deny recovery under Count II because any damages awarded would duplicate those awarded under Count I. Moreover, section 624.155(1)(b)(4) prevents the Court from awarding punitive damages in the absence of evidence of unfair or deceptive acts committed so frequently as to indicate a general business practice.

■ 29. If the Court did not hold that University Creek is entitled to recover under Count I of its counterclaim, it would hold that University Creek could recover damages under Count II because Ticor violated section 624.155(1)(a)(1) by "[f]ailing to acknowledge and act promptly upon communications with respect to claims." *See* Fla.Stat. § 626.9541(1)(i)(3)(c).

University Creek advised Ticor on March 18, 1985 that the Shubows had claimed an interest in the property. Ticor then promised to investigate. Yet, Ticor waited over seven months to advise University Creek of its position with regard to the Shubows' affidavit and *lis pendens,* even though Thornton had decided almost immediately that the Shubows had no legal interest in the property. In the meantime, Thornton twice promised to review with Victor Rones documents related to the purchase of the property, but never did so. Moreover, throughout this time period, Ticor knew that University Creek planned to build a shopping center and knew about the option agreement with Burger King.

30. In addition, if the Court did not hold that University Creek is entitled to recover under Count I of its counterclaim, it would hold for the same reasons cited in Conclusion of Law 28 that University Creek could recover damages under Count II because Ticor violated section 624.155(1)(a)(1) by "[f]ailing to promptly provide a reasonable explanation in writing to the insured of the basis in the insurance policy, in relation to the facts or applicable law, for denial of a claim or for the offer of a compromise settlement." *See* Fla.Stat. § 626.9541(1)(i)(3)(f).

■ 31. Finally, if the Court did not hold that University Creek is entitled to recover under Count I of its counterclaim, it would hold that University Creek could recover damages under Count II because Ticor violated section 624.155(1)(b)(1) by "[n]ot attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests."

Ticor argues that it did not violate section 624.155(1)(b)(1) because its ultimate decision not to pay University Creek "was fairly debatable and thus not in bad faith." (Citing *Reliance Ins. Co. v. Barile Excavating & Pipeline Co.,* 685 F.Supp. 839, 840 (M.D.Fla.1988)). Although the Court considers the Shubows' claim to the property "fairly debatable," the Court does not agree that University Creek's claim under its policy "was fairly debatable."

■ Under Florida law, a title insurer who refuses either to take affirmative action to remove an encumbrance on title, or to deny an insured's claim, has breached its contractual duties. *See, e.g., Shada,* 457 So.2d at 556 (title insurer that refused to act to remove defects in title breached its contractual duty, because insured under a title insurance policy buys insurance to protect against such defects). Ticor waived any right it had to assert that the Shubows' claim to the property lacked merit by refusing to advise University Creek of its position on the matter. Moreover, Gericke's April 11, 1985 letter to Goldman's law partner, Katz, shows that Ticor knew it had to respond to University Creek's claim letter promptly to avoid liability in excess of its costs in quieting title. *See* Findings of Fact 33 & 34. Further, as Gericke's November 6, 1985 note to Thornton concedes, Ticor knew that it had neither admit-

ted nor denied liability for over seven months before it finally decided to advise University Creek of its decision. Hence, the Court finds that Ticor had no reasonable basis for denying University Creek's claim. *See Reliance Ins. Co.,* 685 F.Supp. at 840 (a claim "is not 'fairly debatable' only when there is an absence of a reasonable basis for denial of policy benefits").

### ii. Count III—Negligence

 32. University Creek seeks in Count III to recover damages for Ticor's alleged negligence in performing its duties under the policy. Florida law prohibits the recovery of economic losses in tort where the relationship between the parties is contractual and the alleged tort is not independent of the breach of contract. *See AFM Corp. v. Southern Bell Tel. & Tel. Co.,* 515 So.2d 180 (Fla.1987). Thus, the Court holds that University Creek cannot recover its claimed economic damages in tort because its relationship with Ticor is contractual and it alleges no tort independent of Ticor's breach of contract.

### III. ORDER

Based on the preceding findings of fact and conclusions of law, the Court finds for defendants University Creek, Inc. and Creek Plaza, Inc. on plaintiff Ticor Title Insurance Company's claim for a declaration of no liability under its title insurance policy.

Further, the Court finds for defendants University Creek, Inc. and Creek Plaza, Inc. on Count I of their counterclaim. Thus, the Court will enter judgment in the amount of $242,219.40, which includes $150,000 as damages for breach of contract and $92,219.40 in prejudgment interest.

In addition, the Court holds that University Creek is entitled to recover costs and attorneys' fees. Accordingly, the Court will reserve jurisdiction to determine the amount of University Creek's attorneys' fees and costs upon further submissions of the parties, if they cannot stipulate to those amounts.

Moreover, the Court finds that plaintiff Ticor Title Insurance Company's claim for

a declaration that it did not violate section 626.9541(1)(i)(3)(c), (f) of the Florida Statutes presents no justiciable controversy. Hence, the Court dismisses that claim.

Furthermore, the Court treats the proposed conclusions of law of defendants University Creek, Inc. and Creek Plaza, Inc. as a motion to amend the pleadings to conform to the evidence, and grants the motion. So amended, the Court dismisses Count II of the counterclaim of defendants University Creek, Inc. and Creek Plaza, Inc. under sections 624.155(1)(a), (b), because any damage recoverable under those sections duplicates the damage awarded under Count I of their counterclaim for breach of contract.

Finally, the Court finds for plaintiff Ticor Title Insurance Company on Count III of the counterclaim of defendants University Creek, Inc. and Creek Plaza, Inc.

SO ORDERED.