[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-13540

_____

D. C. Docket No. 01-08287-CV-DTKH

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT**
September 13, 2004
**THOMAS K. KAHN
CLERK**

DADELAND DEPOT, INC.,
DADELAND STATION ASSOCIATES, LTD.,

Plaintiffs-Appellants,

versus

ST. PAUL FIRE AND MARINE INSURANCE CO.,
AMERICAN HOME ASSURANCE COMPANY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 13, 2004)**

Before BIRCH and WILSON, Circuit Judges, and DOWD[*], District Judge.

BIRCH, Circuit Judge:

_____

[*]Honorable David D. Dowd, Jr. United States District Judge for the Northern District of
Ohio, sitting by designation.

Plaintiff-appellant, Dadeland Station Associates ("Dadeland") appeals the dismissal of their claim against defendants-appellees, St. Paul Fire and Marine Insurance Co. and American Home Assurance Co. (collectively, "Sureties") for bad faith in refusing to settle claims involving the performance bond they issued on the contractor of one of Dadeland's business developments. The district court dismissed Dadeland's claim for two primary reasons: (1) Dadeland did not satisfy the conditions precedent for bringing a bad-faith claim and (2) Dadeland was barred from bringing this claim under principles of res judicata because Dadeland could have included this claim in its prior arbitration proceedings against the Sureties. Because we find that this case turns on important questions of state law for which there is no controlling precedent, we defer our decision pending certification of these questions to the Supreme Court of Florida.

## I. BACKGROUND

Dadeland leases and manages commercial properties in Florida. In 1995, Dadeland entered into a contract with Walbridge Contracting, Inc., for the construction of Dadeland Station, a shopping center located in Miami, Florida. Miami-Dade County owns the property and is the lessor of the land on which the project is situated. In connection with that project, the Sureties issued a standard performance bond in the amount of $26,500,000.00. Dadeland is the obligee,

referred to as the "Owner" on the bond; Walbridge is the principal, referred to as the "Contractor"; and the defendant insurance companies are the Sureties. Under the terms of the bond, Dadeland must inform the Contractor and the Sureties if the contractor has failed to complete performance under the construction contract, and the Sureties are obligated to take certain steps to ensure that the construction is completed.

Walbridge started work on Dadeland Station in September or October of 1995. The project was completed, opened, and leased to commercial tenants in November of 1996. After the project was opened and the tenants had moved in, however, Dadeland's consulting engineer advised the plaintiffs about certain construction defects and urged them to have the project inspected. Dadeland brought these defects to Walbridge's attention.

Shortly thereafter, Metropolitan Dade County building officials determined that the Dadeland Station project violated a number of provisions of the South Florida Building Code. Dadeland and County officials then entered into an agreement, which set forth a timetable of tasks that Dadeland was required to perform to bring the project into compliance with the building code. Dadeland asked Walbridge to repair the defective work. Walbridge, however, asserted that certain design defects were the fault of Dadeland Station's structural engineer or its

3

architect and that he would not repair defects that were the fault of others or were outside the scope of its responsibility.

On 24 September 1997, Dadeland's attorney wrote to Walbridge and the Sureties stating that Dadeland had reason to believe that Walbridge failed to perform its obligations under the construction contract. Dadeland informed Walbridge and the Sureties that it was considering declaring a contractor default and requested a conference to discuss repair issues. On 22 October 1997, representatives for Dadeland, Walbridge, and the Sureties attended the conference at which Walbridge agreed to make certain repairs to the project within a certain time period. On 18 March 1998, Dadeland's attorney notified Walbridge and the Sureties that Walbridge had failed to perform any of the agreed repairs and that "[Dadeland] intends to proceed with arbitration and to make arrangements to have another contractor make the necessary repairs." R2-71, Ex. 12 at 2. In its subsequent arbitration complaint, Dadeland alleged that Walbridge was required under the construction contract to submit final as-built drawings to Dadeland and Dade County officials, but failed to do so. Dadeland also alleged that Walbridge wrongfully failed and refused to perform all but a small portion of the needed repairs, and that the Sureties had failed to take any action to correct the deficiencies. Dadeland requested approximately $4.4 million in damages resulting

4

from expenditures it made for repairs, security, legal fees, engineering fees, and administrative costs.

On 20 November 1998, Dadeland's attorney again notified Walbridge and the Sureties that Walbridge was not performing repair work it had promised to do within a reasonable time frame. Dadeland requested that Walbridge provide a work schedule by 25 November 1998, but it did not respond. On 14 December 1998, Dadeland informed Walbridge and the Sureties of its decision to formally declare a contractor default and terminate Walbridge's right to complete the contract or perform corrective work on the project. Dadeland demanded that the Sureties take action to correct Walbridge's mistakes in accordance with the surety bond, but also indicated that it would not agree to continue to use Walbridge as the contractor.

Tom Groseclose, a St. Paul bond claims specialist, responded on behalf of the Sureties, and stated that the Sureties were conducting an investigation. Four days later, Dadeland informed Groseclose that the Sureties had not taken action within the time period required under the bond and made an additional demand that the Sureties perform their obligations. Steven Grunsfeld, another surety representative, responded that the Sureties had performed as required by the contract documents. Grunsfeld also stated that, with respect to any defective work

5

for which Walbridge and the subcontractors may have had responsibility, "Walbridge has either had the appropriate subcontractors correct the work or remains willing to have them do so. However, Walbridge is not responsible for the numerous defects on this project." Id., Ex. 20 at 1.

While Dadeland had earlier indicated that it intended to terminate its relationship with Walbridge, it nevertheless permitted Walbridge to proceed with repairs to the project. At the same time, Dadeland filed suit against its engineer, whose liability insurer settled the case for approximately $900,000.00. Dadeland did not file suit against the architect.

When this case finally went to arbitration, the arbitration proceedings involved 35 days of hearings, over 1,000 exhibits, and 25 witnesses. In an order dated 15 May 2000, the arbitration panel found that all parties, including the engineer, the architect, Dade County, Dadeland, and Walbridge, were liable for the deficient construction of Dadeland Station. The arbitration panel entered an award whereby Walbridge owed Dadeland $1,417,842 for its defective work and Dadeland owed Walbridge $261,036 for contract balances and extra work. The panel then stated that the Sureties were "bound to this award to the extent that [Walbridge] is obligated under the award and its defenses are denied." Id., Ex.. 23 at 5.

6

On 28 February 2001, Dadeland filed this action in the Fifteenth Judicial Circuit of Florida alleging that the Sureties, the issuers of the performance bond, had engaged in bad-faith refusals to perform their duties under the bond. Dadeland alleged that, as a result of the Sureties' actions, it sustained damage by having to repair inadequate work performed and having to present their claims to arbitration. The Sureties removed the case to federal court.

The district court interpreted Dadeland's claim as being both a claim for bad-faith refusal to settle under Fla. Stat. §§ 624.155(1)(b)(1) and 626.9541(1)(a) (1999), and a breach of contract claim for the Sureties' failure to timely perform their contractual duties. The district court then found that both claims failed. As for the bad-faith claim, the district court found that it failed because Dadeland had not alleged that there had been a prior determination that the Sureties were liable for a claim on the bond. The district court also found that the bad-faith claim failed because Florida law required evidence that the Sureties' unfair claim settlement practices were frequent enough to be considered their general business practice. As for the breach of contract claim, the district court held that it was barred by res judicata because Dadeland could have brought the claim in the arbitration proceeding. Dadeland appeals the district court's decision..

## II. DISCUSSION

Dadeland argues on appeal that the district court committed five errors. The first two of its arguments relate to the district court's interpretation of Florida statutory law. These arguments are: (1) that dicta in the district court's opinion, which suggests that Fla. Stat. § 624.155(1)(b)(1) does not provide a cause of action against sureties, is incorrect;[1] and (2) that Florida law does not require proof of a general business practice to bring a claim of bad-faith refusal to settle. Dadeland's remaining three arguments relate to the effect of the arbitration award on the present litigation. These arguments are: (1) that the arbitration proceedings satisfied the condition precedent that they have a prior judgment of the Sureties' liability before bringing a bad-faith refusal-to-settle claim; (2) that Dadeland could not have brought this claim in the arbitration proceeding and, as a result, the arbitration cannot have a <u>res judicata</u> effect on this case; and (3) that the district court erred in finding that the arbitration proceedings did not collaterally estop the Sureties from raising the same affirmative defenses in this case as were raised—and rejected—in the arbitration. We discuss Dadeland's arguments in turn and we certify questions to the Supreme Court of Florida to guide our holding on each issue.

A. <u>Issues of Statutory Interpretation</u>

---

[1] Although the district court did not make a determination on this issue, we address it here because it is a threshold issue and because Dadeland raises it in its brief.

<u>1. Does Florida law provide for a bad-faith action against sureties?</u>

Fla. Stat. § 624.155(1)(b)(1) states that any person may bring a civil suit against an insurer when the insurer does not act "in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests." Dadeland argues that the plain language of this statute indicates that a surety is subject to a bad-faith suit because it applies to acts of an insurer and the Florida legislature has defined insurer to include sureties. <u>See</u> Fla. Stat. § 624.03.

However, the Florida Supreme Court has also stated that § 624.155(1)(b)(1) permits actions only by insureds—the person or entity to whom the insurer owes a duty. <u>State Farm Fire & Cas. Co. v. Zebrowski</u>, 706 So. 2d 275, 277 (Fla. 1997). The Sureties point out that neither the Florida courts nor the Florida legislature has specifically stated whether the obligee of a surety bond is considered an "insured" for purposes of bringing suit under this statute. Therefore, before we can determine whether this case was properly dismissed, we must first determine if this statute provides a right of action for obligees to sue their sureties for bad faith. Thus, we certify the following question to the Supreme Court of Florida:

> IS THE OBLIGEE OF A SURETY CONTRACT CONSIDERED AN "INSURED" SUCH THAT THE OBLIGEE HAS THE RIGHT TO SUE THE SURETY FOR BAD-FAITH REFUSAL TO SETTLE CLAIMS UNDER § 624.155(1)(b)(1)?

2. Is proof of a general business practice required?

If the Supreme Court of Florida answers the first question in the affirmative,

we must then ask whether the statute requires the plaintiff in a bad-faith refusal-to-

settle claim to prove that the defendants engage in unfair settlement practices

frequently enough for the behavior to be considered a general business practice.  In

order to fully explain this issue, some preliminary discussion of Florida's statutory

scheme is necessary.

Dadeland's complaint states that it is bringing its bad-faith claim under both

§ 624.155(1)(b)(1) and § 626.9541(1)(i).[2]  Section 626.9541(1)(i) explicitly

requires proof of a general business practice.  However, the right of action to sue

based on a violation of § 626.9541(1)(i) is found in § 624.155(1)(a)(1), and §

624.155(1)(b)(3) states, "[n]otwithstanding the provisions of the above to the

contrary, a person pursuing a remedy under this section need not prove that such

act was committed or performed with such frequency as to indicate a general

business practice."

Dadeland argues that this language applies to § 624.155 in its entirety

_____

[2]  This particular issue appears to involve Dadeland's claim under § 626.9541(1)(i) only.
The Sureties, in their brief, admit that claims brought under § 624.155(1)(b) do not require proof
of a general business practice.

10

because of the language "a person pursuing a remedy under this section."

Moreover, Dadeland argues that § 626.9541 is the only statute incorporated into § 624.155 that requires proof of a general business practice and, thus, § 624.155(1)(b)(3) is meaningless if it does not apply to claims brought under § 626.9541 through § 624.155(1)(a). The Sureties, on the other hand, argue that the language in § 624.155(1)(b)(3) applies only to subsection (b) of § 624.155 and not to subsection (1)(a). Therefore, the Sureties contend that a claim brought under § 626.9541 through § 624.155(1)(a) still requires proof of a general business practice.

Because this issue has not yet been addressed by the Florida courts, we also certify the following question to the Supreme Court of Florida:

> DOES THE LANGUAGE IN § 624.155(1)(b)(3) ELIMINATE § 626.9541's REQUIREMENT OF PROOF OF A GENERAL BUSINESS PRACTICE WHEN THE PLAINTIFF IS PURSUING A § 626.9541 CLAIM THROUGH THE RIGHT OF ACTION PROVIDED IN § 624.155?

Once we have established the requirements of the statute, we must then ask what the effect of the arbitration proceeding was on Dadeland's right to bring this action. The first two questions involving the effect of the arbitration proceedings are sufficiently intertwined that we are certifying one, two-part question to the Supreme Court of Florida that incorporates both issues. Therefore, we discuss

11

both issues before stating the question.

B.    Effect of Arbitration Proceedings

1. Did the arbitration proceeding satisfy Dadeland's condition precedent?

To bring a bad-faith refusal-to-settle claim, Florida requires, as a condition precedent, that the plaintiff "can allege that there has been a determination of the insured's damage." Talat Enters., Inc. v. Aetna Cas. & Sur. Co., 952 F. Supp. 773, (M.D. Fla. 1996), aff'd, 217 F.3d 1318 (11th Cir. 2000). See also Blanchard v. State Farm Mut. Auto. Ins. Co., 575 So. 2d 1289, 1291 (Fla. 1991).

Dadeland contends that the arbitration award's finding that "[t]he Surety is bound to [the arbitration] award to the extent that [Walbridge] is obligated under the award and its defenses are denied," R2-71, Ex. 23 at 5, satisfies this condition precedent. Dadeland argues that the district court's analysis ignores the purpose of the condition precedent: to provide evidence that the insured had a valid claim against the insurer, which the insurer should have settled when the claim was first made. See Brookins v. Goodson, 640 So. 2d 110, 112 (Fla. Dist. Ct. App. 1994) (noting that the purpose of requiring the condition precedent is "to show that the insured had a valid claim"). Dadeland asserts that the arbitration award serves this purpose because it shows that Dadeland had a valid claim against the surety for repairs made necessary by Walbridge's deficiencies. The district court disagreed

12

and found that the arbitration proceeding was not a prior adjudication because the arbitrator did not make a specific finding that the surety had breached its duty under the bond.[3]

### 2. Does the arbitration proceeding bar this lawsuit?

Nevertheless, the district court did find the arbitration to be complete enough to be res judicata, completely barring Dadeland from bringing this bad-faith claim. The district court determined that Dadeland's claims were not really bad-faith claims, but were actually claims for breach of the Sureties' contractual duty to timely settle valid claims. As a breach of contract claim, the district court reasoned that Dadeland could have and should have raised this claim in its arbitration complaint. Thus, by not raising it there, the district court concluded that the claim was waived.

Dadeland argues that the district court was incorrect in its assessment that its claims were really breach of contract claims and points out that the only statutory basis for their claims listed in their complaint are the Florida bad-faith statutes.[4] Dadeland then argues that it could not possibly have asserted its bad-faith claims in

---

[3] However, we note that the purpose of the surety bond is to provide protection against breaches by the contractor, Walbridge, not against breaches by the surety. The Sureties' primary duty under the bond is to settle claims resulting from Walbridge's liability.

[4] More specifically, Dadeland argues that the Sureties breached their duty to settle in good faith by not adequately investigating Dadeland's claims against the bond.

13

its arbitration complaint because, at the time of the arbitration, Dadeland did not have an adjudication in its favor showing that it had a valid claim against the Sureties. Dadeland states that one purpose of the arbitration was to satisfy the condition precedent to bringing this claim.

Given the confusion as to the effect of this arbitration proceeding, we certify the following questions to the Supreme Court of Florida:

1. IS THE ARBITRATOR'S FINDING THAT A SURETY'S PRINCIPAL HAS BREACHED ITS DUTY TO THE OBLIGEE, AND THAT THE SURETY IS BOUND TO THE ARBITRATION AWARD TO THE EXTENT THAT ITS PRINCIPAL IS BOUND, SUFFICIENT TO SATISFY THE CONDITION PRECEDENT TO A LATER BAD-FAITH REFUSAL-TO-SETTLE CLAIM THAT THERE BE A PRIOR ADJUDICATION THAT THE PLAINTIFFS WERE ENTITLED TO A PAYMENT OF A CLAIM FROM THE SURETIES?

2. IF NOT, IS THAT ARBITRATOR'S DECISION RES JUDICATA, THUS BARRING DADELAND'S LATER CLAIM AGAINST THE SURETIES FOR BAD-FAITH REFUSAL TO SETTLE?

3. DOES THE ARBITRATOR'S DISMISSAL OF THE SURETIES' AFFIRMATIVE DEFENSES COLLATERALLY ESTOP THEM FROM RAISING THE SAME DEFENSES IN THIS SUIT?

Finally, Dadeland argues that the district court erred when it denied Dadeland's motion for partial summary judgment with respect to two of the sureties' affirmative defenses: (1) that Dadeland "failed to comply with the provisions of the performance bond" and (2) that the Sureties are "[d]ischarged from liability under the performance bond to the extent that [Dadeland] made

14

payments to Walbridge for the work performed under the construction contract."

R1-36 at 4. Dadeland argues that these are equivalent to the defenses the Sureties

raised in the arbitration proceeding, and which the arbitrator rejected. As a result,

Dadeland contends that the Sureties are collaterally estopped from raising these

same defenses in this case.

At first glance, Dadeland appears to be correct that the defenses are the

same. In the arbitration, the Sureties argued that "Dadeland's Failure to Comply

With the Terms of the Bond Bars Its Claim" and that "Dadeland's Improper

Payments to Walbridge Bar or Limit Dadeland's claim Against [the Sureties]."

R2-66, Ex.. A at 4, 11. However, the Sureties argue that these defenses function

differently in this case because this is a bad-faith claim rather than a breach-of-

contract claim, as was at issue in the arbitration proceeding.[5]

Because we are unsure of the effects of the prior arbitration on this case

under Florida law, we also certify this question to the Supreme Court of Florida:

WILL AN ARBITRATOR'S DENIAL OF THE

---

[5] For example, the Sureties argue that their proof would be different in the two proceedings with respect to the defense that Dadeland failed to comply with the notice provisions of the bond:

> In the breach of contract action, the affirmative defense would show that [Dadeland's] failure to comply . . . excused [the Sureties] from performing their obligations under the bond. In the bad faith case, however, the same affirmative defense would show [that the Sureties] reasonably relied on the fact that [Dadeland] did not properly declare a contractor default under the bond.

Appellee's Br. at 22.

15

DEFENDANT'S AFFIRMATIVE DEFENSES IN A BREACH OF CONTRACT CLAIM COLLATERALLY ESTOP THE SAME DEFENDANTS FROM RAISING THE SAME DEFENSES IN A SUBSEQUENT BAD-FAITH REFUSAL-TO-SETTLE CLAIM AGAINST THE SAME PLAINTIFF?

### III. CONCLUSION

Because this is an area entirely controlled by Florida law, and because the

Florida courts have yet to address these issues, we certify the following questions

to the Supreme Court of Florida:

1. IS THE OBLIGEE OF A SURETY CONTRACT CONSIDERED AN "INSURED" SUCH THAT THE OBLIGEE HAS THE RIGHT TO SUE THE SURETY FOR BAD-FAITH REFUSAL TO SETTLE CLAIMS UNDER § 624.155(1)(b)(1)?

2. IF SO, DOES THE LANGUAGE IN § 624.155(1)(b)(3) ELIMINATE § 626.9541's REQUIREMENT OF PROOF OF A GENERAL BUSINESS PRACTICE WHEN THE PLAINTIFF IS PURSUING A § 626.9541 CLAIM THROUGH THE RIGHT OF ACTION PROVIDED IN § 624.155?

3. IS AN ARBITRATOR'S FINDING THAT A SURETY'S PRINCIPAL HAS BREACHED ITS DUTY TO THE OBLIGEE, AND THAT THE SURETY IS BOUND TO THE ARBITRATION AWARD TO THE EXTENT THAT ITS PRINCIPAL IS BOUND, SUFFICIENT TO SATISFY THE CONDITION PRECEDENT TO A LATER BAD-FAITH REFUSAL TO SETTLE CLAIM THAT THERE BE A PRIOR ADJUDICATION THAT THE PLAINTIFFS WERE ENTITLED TO A PAYMENT OF A CLAIM FROM THE SURETIES?

4. IF NOT, IS THAT ARBITRATOR'S DECISION <u>RES JUDICATA</u> BARRING DADELAND'S LATER CLAIM AGAINST THE SURETIES FOR BAD-FAITH REFUSAL TO SETTLE?

16

5. WILL AN ARBITRATOR'S DENIAL OF THE DEFENDANT'S AFFIRMATIVE DEFENSES IN A BREACH OF CONTRACT CLAIM COLLATERALLY ESTOP THE SAME DEFENDANTS FROM RAISING THE SAME DEFENSES IN A SUBSEQUENT BAD-FAITH REFUSAL TO SETTLE CLAIM AGAINST THE SAME PLAINTIFF?

In order to assist the Florida Supreme Court's consideration of the case, the entire record, along with the briefs of the parties, shall be transmitted to the court.

QUESTIONS CERTIFIED.