945 So.2d 1216 (2006)
DADELAND DEPOT, INC., et al., Appellants,
v.
ST. PAUL FIRE AND MARINE INSURANCE CO., et al., Appellees.
No. SC04-1828.
Supreme Court of Florida.
December 21, 2006.
*1218 Philip M. Burlington of Philip M. Burlington, P.A., Jeffrey M. Liggio and Richard Benrubi of Liggio, Benrubi and Williams, P.A., West Palm Beach, FL, for Appellant.
Lee Craig and Veronica D. Vellines of Butler, Pappas, Weihmuller, Katz and Craig, LLP, Tampa, FL, for Appellee.
Stephen A. Marino, Jr. of Ver Ploeg and Lumpkin, P.A., Miami, FL, on behalf of the Academy of Florida Trial Lawyers; E.A. "Seth" Mills, Jr. and Brett D. Divers of Mills, Paskert, Divers, P.A., Tampa, FL, on behalf of the Surety Association of America; and Bruce G. Alexander and Ronald E. Crescenzo of Boose, Casey, Ciklin, Lubitz, Martens, McBane and O'Connell, West Palm Beach, FL, on behalf of Florida AGC Council, Inc., Florida Transportation Builders' Association, Inc., and Associated Builders and Contractors of Florida, for Amicus Curiae.
LEWIS, C.J.
We have for review five very discrete questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that are determinative of a cause pending in that court and for which there appears to be no controlling precedent. We have jurisdiction. See art. V, § 3(b)(6), Fla. Const. Based on the facts and analysis outlined below, we answer the first, second, third, and fifth questions certified by the Eleventh Circuit in the affirmative, and hold that the fourth certified question should be answered in the negative.

FACTS
This action arises from an appeal to the United States Court of Appeals for the Eleventh Circuit wherein the plaintiffs-appellants Dadeland Depot, Inc., and Dadeland Station Associates, Ltd. (hereinafter "Dadeland") asserted that the United States District Court for the Southern District of Florida erred in entering a summary judgment in favor of the defendants-appellees *1219 St. Paul Fire and Marine Insurance Company and American Home Assurance Company (hereinafter "St. Paul") and dismissing Dadeland's claim against St. Paul for bad faith in refusing to settle a claim under a performance bond issued by St. Paul on one of Dadeland's business developments. Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 383 F.3d 1273 (11th Cir.2004). In its opinion, the Eleventh Circuit deferred rendering a decision pending certification of several questions to this Court due to the circuit court's concern that "th[e] case turns on important questions of state law for which there is no controlling precedent." Id. at 1273.
The relevant facts, as outlined in the Eleventh Circuit's opinion, demonstrate that in 1995, Dadeland entered into a contract with Walbridge Contracting, Inc. (hereinafter "Walbridge"), for the construction of a shopping center (hereinafter the "project") located in Miami, Florida. See id. In connection with this project, St. Paul issued a standard performance bond (hereinafter "the bond") in the amount of $26,500,000, the face amount of the initial construction contract. See id. Pursuant to the terms of the bond, Walbridge was named as the principal, Dadeland was named as the owner, and St. Paul was named as the surety. See id. The bond incorporated the terms of the construction contract and bound both Walbridge and St. Paul to the performance of the contract. Under the terms of the bond, if the contractor failed to complete performance of the construction contract, Dadeland was required to take certain steps to trigger St. Paul's obligations under the bond. See id. Once Dadeland completed the steps outlined by the bond, St. Paul was required to fulfill its obligations in accordance with the terms of the bond. See id.
Walbridge began work on the project in September or October of 1995. See id. The project was completed, opened, and leased to commercial tenants in November of 1996. See id. On July 24, 1997, Dadeland and Walbridge entered into a settlement agreement which acknowledged that the project was complete and released each other, along with St. Paul, from future liability with the exception of certain specifically identified items. Subsequent to completion and tenant occupancy, Dadeland's consulting engineer notified Dadeland of the existence of certain construction defects, which information Dadeland accordingly passed to Walbridge. See id. at 1273-74. Shortly thereafter, county building officials determined that the project contained violations of numerous provisions of the South Florida Building Code. See id. at 1274. Dadeland then contacted Walbridge and requested that the defective work be repaired. See id. In response, Walbridge asserted that certain defects were due to Dadeland's structural engineer or its architect or both of them, and that Walbridge would not repair defects that were due to the fault of others or beyond the scope of its responsibility. See id.
On September 24, 1997, Dadeland notified Walbridge and St. Paul that Dadeland had reason to believe that Walbridge had failed to perform its obligations under the construction contract. See id. In accordance with the requirements of the bond, Dadeland informed St. Paul and Walbridge that Dadeland was considering declaring a contractor default and requested a conference to discuss repair issues. See id. This conference was held on October 22, 1997, with representatives for Dadeland, Walbridge, and St. Paul in attendance. See id. At the conclusion of this conference, Walbridge agreed to make certain repairs within a specified time period. See id. On March 18, 1998, Dadeland notified *1220 Walbridge and St. Paul that Walbridge had failed to perform any of its obligations pursuant to the October 22 agreement, and that Dadeland intended to proceed with arbitration and to arrange for another contractor to make the necessary repairs. See id.
On March 20, 1998, Dadeland filed an arbitration complaint naming Walbridge and St. Paul as respondents. See id. Dadeland alleged that Walbridge had failed to fulfill its obligation under the terms of the construction contract by neglecting to submit final as-built drawings to Dadeland and county officials. See id. Dadeland further asserted that Walbridge wrongfully failed and refused to perform all but a very small portion of the agreed-upon repairs, and that St. Paul had failed to take any action to correct the deficiencies. See id. Dadeland requested damages in the amount of approximately $4.4 million. See id.
The arbitration proceedings in this case involved thirty-five days of hearings, over one thousand exhibits, and twenty-five witnesses. See id. at 1275. By order dated May 15, 2000, the arbitration panel concluded that all parties, including the engineer, the architect, Dade County, Dadeland, and Walbridge were responsible for the deficient construction of the project. The arbitration panel determined that Walbridge owed Dadeland $1,417,842 for its defective work, and that Dadeland owed Walbridge $261,036 for contract balances and additional work performed. See id. In addition, the arbitration panel included the following provision with regard to St. Paul in its award:
[St. Paul] is bound to this award to the extent that [Walbridge] is obligated under the award and its defenses are denied.
The monetary award was timely paid by Walbridge with interest.
After entry of the arbitration order, Dadeland filed the instant action in the Fifteenth Judicial Circuit of Florida asserting that St. Paul had engaged in a bad-faith refusal to perform the duties required under the bond in contravention of sections 624.155(1)(b)(1) and 626.9541(1)(i) of the Florida Statutes (1995). See 383 F.3d at 1275. St. Paul removed the case to federal court and moved to dismiss the action. The trial court denied the motion and entered a detailed order which explained the applicable conclusions of law. The court reasoned, in part, that Dadeland had standing to advance this action because it had sufficiently presented discrete and concrete injury and damage due to nonperformance of the insurance contract which would support a claim for statutory bad faith. Two years later, St. Paul moved for summary judgment after this case was transferred to a different division of the trial court. The United States District Court for the Southern District of Florida then granted St. Paul's motion and entered a summary judgment. See id. The district court concluded that Dadeland had failed to allege that there had been a prior determination that St. Paul was actually liable to Dadeland under the terms of the bonda condition precedent to instituting a bad-faith claim in Florida. See id. Additionally, the court found that any bad-faith claim was not sustainable because Dadeland had failed to establish that any alleged unfair claims practice of St. Paul was frequent enough to be considered a general business practice. See id. Lastly, as to any claim for breach of contract, the district court determined that such claim was barred by res judicata, reasoning that it could have been asserted during the arbitration proceedings. See id. Dadeland appealed the judgment of the district court, seeking review in the Eleventh Circuit. See id. Although the dissent would *1221 decline to answer the questions certified because in its view no discrete statutory bad faith damages exist, this position was not advanced by the appellees nor was it the basis of the trial court's decision. Additionally, no issue relating to damages has been certified to us, nor does the present record provide a sufficient basis for that analysis.
On appeal, the Eleventh Circuit noted that the issues were "entirely controlled by Florida law, and [that] because the Florida courts have yet to address the[ ] issues" decided by the district court, the Eleventh Circuit, prior to rendering its decision in the matter, deemed it necessary to certify the following questions to this Court:
1. IS THE OBLIGEE OF A SURETY CONTRACT CONSIDERED AN "INSURED" SUCH THAT THE OBLIGEE HAS THE RIGHT TO SUE THE SURETY FOR BAD-FAITH REFUSAL TO SETTLE CLAIMS UNDER § 624.155(1)(b)(1)?
2. IF SO, DOES THE LANGUAGE IN § 624.155(1)(b)(3) ELIMINATE § 626.9541's REQUIREMENT OF PROOF OF A GENERAL BUSINESS PRACTICE WHEN THE PLAINTIFF IS PURSUING A § 626.9541 CLAIM THROUGH THE RIGHT OF ACTION PROVIDED IN § 624.155?
3. IS AN ARBITRATOR'S FINDING THAT A SURETY'S PRINCIPAL HAS BREACHED ITS DUTY TO THE OBLIGEE, AND THAT THE SURETY IS BOUND TO THE ARBITRATION AWARD TO THE EXTENT THAT ITS PRINCIPAL IS BOUND, SUFFICIENT TO SATISFY THE CONDITION PRECEDENT TO A LATER BAD-FAITH REFUSAL TO SETTLE CLAIM THAT THERE BE A PRIOR ADJUDICATION THAT THE PLAINTIFFS WERE ENTITLED TO A PAYMENT OF A CLAIM FROM THE SURETIES?
4. IF NOT, IS THAT ARBITRATOR'S DECISION RES JUDICATA BARRING DADELAND'S LATER CLAIM AGAINST THE SURETIES FOR BAD-FAITH REFUSAL TO SETTLE?
5. WILL AN ARBITRATOR'S DENIAL OF THE DEFENDANT'S AFFIRMATIVE DEFENSES IN A BREACH OF CONTRACT CLAIM COLLATERALLY ESTOP THE SAME DEFENDANTS FROM RAISING THE SAME DEFENSES IN A SUBSEQUENT BAD-FAITH REFUSAL TO SETTLE CLAIM AGAINST THE SAME PLAINTIFF?
Id. at 1279. This proceeding has followed.

ANALYSIS
Initially, contrary to the position of the dissent that no damages cognizable under the bad faith statute exist and the dissent's preference that we decline to respond to any of the certified questions, the United States Court of Appeals is very specific in the discrete questions certified and we most certainly afford that Court credibility to understand its own record and the damages that may have been sustained. This case was concluded at the trial level in a summary judgment without trial and the full development of evidence as to the extent or nature of the damages claimed as a result of statutory bad faith. We most certainly will not presume that the questions certified by the federal court are without any purpose, particularly on the record before us. Additionally, we note that the United States Court of Appeals has not certified any questions with regard to the concerns of the dissent.
Secondly, we note that the first question certified by the Eleventh Circuit is extremely narrow. The question posed by *1222 the circuit court does not require that we comment on the merit or wisdom of the statutory section at issue, nor does the question require that this Court define the similarities and differences between suretyship and other forms of insurance. Rather, the task with which we are confronted today is to provide the construction of section 624.155(1)(b)(1) of the Florida Statutes (1999), as enacted by the Legislature and its application as writtennot as we might think it should have been written. Accordingly, this decision does not address the merits of Dadeland's claim as we merely construe the language of section 624.155(1)(b)(1) of the Florida Statutes (1999), as passed by the Legislature and nothing more.
The first certified question implicates only a single subsection of section 624.155 of the Florida Statutes (1999). The statutory provision that is to be analyzed pursuant to the question certified states:
(1) Any person may bring a civil action against an insurer when such person is damaged:
. . . .
(b) By the commission of any of the following acts by the insurer:
1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests;. . . .
§ 624.155(1)(b)(1), Fla. Stat. (1999). The Eleventh Circuit's question regarding this statutory provision reflects that the term "insured" in the above-quoted statute has not been defined by the Legislature, nor has the definition of that term in this context been addressed by this Court. The Eleventh Circuit has certified the question of whether the obligee of a surety bond is considered an "insured" for purposes of initiating an action under this statute as determinative of this cause of action by Dadeland.
The dissent expresses a preference for the Court to decline to answer the first certified question, asserting that there are no damages to be recovered in a bad faith action, which results in the certified question not being determinative of this cause of action. However, the dissent fails to recognize that section 624.155 expressly provides for the award of extra-contractual damages for bad faith conduct in connection with the insurance contract clearly beyond those that may have been awarded under the construction contract. Therefore, whether Dadeland is entitled to an award for bad faith damages resulting from a failure to act in good faith under the bond beyond any contractual amounts owed can only be properly determined as this case proceeds to trial and Dadeland is afforded the opportunity to develop and prove damages, if any, suffered as a result of the alleged bad faith conduct of St. Paul. The legislation specifically contemplates damages recoverable under the bad faith statute that are a reasonably foreseeable result of a specified violation of the applicable section by the insurer and may include an award or judgment in an amount that exceeds the insurance amount. See § 624.155(7), Fla. Stat. (1999). In Time Insurance Co. v. Burger, 712 So.2d 389 (Fla.1998), we specifically recognized that the Legislature has specifically authorized first parties to recover damages in bad faith actions and that the legislation contemplated more than the recovery of the same damages already available in a breach of contract action.[1] If the damages *1223 established by Dadeland at trial are merely duplicative of those submitted to and awarded by the arbitration panel, we would agree that Dadeland would not be entitled to recover those identical damages in a bad faith action. However, the damages at issue in this action are those resulting from a statutory violation and bad faith under the bond, which could not have been presented prior to resolution of the underlying construction contract dispute. Our analysis is buttressed by Dadeland's complaint in this bad faith action which sought recovery for "actual damages, including but not limited to . . . loss of use of monies . . . [and] loss of business opportunities." A review of Dadeland's demand for arbitration reveals that recovery for these consequential bad faith damages was not and undoubtedly could not have been sought by Dadeland in the arbitration forum. The dissent fails to recognize this fact and, therefore, incorrectly concludes that because the arbitration award has been paid in full, there can be no basis for a bad faith cause of action here because Dadeland has received full compensation for the damages alleged in this statutory bad faith claim, i.e., the amount expended to repair the inadequate work that was performed by Walbridge. The problem with the view expressed by the dissent is that it fails to acknowledge that the arbitration addressed only the construction contract, not a bad faith claim, and that Dadeland has claimed consequential bad faith damages in this bad faith action which are in addition to the damages asserted and awarded at the arbitration. This deficiency in the dissent's analysis is rooted in its refusal to recognize the damages actually being sought by Dadeland in the complaint filed in this matter, and instead concluding that the Court should accept statements contained within the trial judge's order and the Eleventh Circuit's recitation of the facts as to what damages Dadeland is seeking in this bad faith action. However, contrary to the dissent's position, at this point in these proceedingsat the summary judgment stage prior to Dadeland having the opportunity to prove the damages alleged in its complaintwe refuse to simply ignore the actual prayer for relief in the complaint and the damages alleged therein.
Contrary to the views expressed by the dissent, we conclude that the first certified question concerning whether the obligee of a surety contract is properly considered an insured for purposes of section 624.155(1)(b)(1) is properly before this Court, and that the facts of this case present an opportunity for us to clarify the law in Florida on this issue. The question was certified to this Court because we have no controlling precedent on this issue and the federal court considers this question to be determinative of the cause of action. We now turn to our analysis of the first question certified by the Eleventh Circuit.
*1224 The scope of the duty created by section 624.155(1)(b)(1) in the third-party tortfeasor context was addressed by this Court in State Farm Fire & Casualty Co. v. Zebrowski, 706 So.2d 275 (Fla.1997). In Zebrowski, we considered whether an injured third party could institute an action against a liability insurer under section 624.155(1)(b)(1) subsequent to the third party obtaining a judgment against State Farm's insured in a personal injury action that was within the insured's policy limits and satisfied by State Farm. See id. at 275. In holding that the statutory provision did not provide a cause of action, we noted that although the statute provides that "any person may bring a civil action," § 624.155(1), Fla. Stat. (1999) (emphasis supplied), it is "necessary to consider what th[e] words ["any person"] modify in order to determine the particular persons authorized to pursue the various claims authorized by section 624.155." Zebrowski, 706 So.2d at 277. In addressing subsection (b), the Court determined that
the cause of action is predicated on the failure of the insurer to act "fairly and honestly toward its insured and with due regard for his interests." The duty runs only to the insured. Therefore, in the absence of an excess judgment, a third-party plaintiff cannot demonstrate that the insurer breached a duty toward its insured. See Dunn v. National Sec. Fire & Cas. Co., 631 So.2d 1103 (Fla. 5th DCA 1993) (only damages caused to the insured are recoverable under section 624.155(1)(b) 1).
Zebrowski, 706 So.2d at 277 (emphasis supplied). Therefore, pursuant to our decision in Zebrowski, whether Dadeland qualifies as an "insured" as that term is used in section 624.155 is crucial in determining whether a valid cause of action is available, because we have determined that the duty imposed by subsection (1)(b)(1) flows only to an "insured."
Initially, as we begin the analysis we note that Florida's Insurance Code is abundantly clear that a surety is included within the definition of an "insurer" and is regulated as an "insurer." Section 624.03 of the Florida Statutes defines an insurer as "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity." § 624.03, Fla. Stat. (1999) (emphasis supplied). Most importantly, in David Boland, Inc. v. Trans Coastal Roofing Co., 851 So.2d 724 (Fla.2003), we have already specifically noted that the term "`insurer' is clearly defined under the Florida Insurance Code to include a `surety.'" Id. at 726 n. 1 (citing Nichols v. Preferred Nat'l Ins. Co., 704 So.2d 1371, 1373 (Fla.1997)). Moreover, the different classifications of insurance that exist within the State of Florida as provided by the Legislature explicitly include suretyship as one of those classifications. See § 624.6011, Fla. Stat. (1999) ("Insurance shall be classified into the following `kinds of insurance': . . . (5) Surety."). Additionally, surety contracts are also included within Florida's Insurance Code as a type of insurance contract. See §§ 627.751.759, Fla. Stat. (1999). "Surety insurance" is defined in terms of a "contract bond" or "performance bond." See § 624.606(1)(a), Fla. Stat. (1999). On consideration of the initial motion to dismiss, the trial court here reasoned "that the language in the statute is not ambiguous, nor unclear" in concluding that the statute afforded a basis for a bad faith action in this context. With this foundation, it is clear that the Legislature intended that sureties would be governed by Florida's Insurance Code. However, the Legislature's inclusion of a surety within its definition of an "insurer," along with its inclusion of suretyship as a "kind of insurance," although persuasive, may not necessarily answer the question of *1225 whether an obligee of a surety is an "insured" for purposes of section 624.155(1)(b)(1).
Dadeland asserts that the term "insured" is not defined by section 624.155, and, therefore, its meaning must and should be derived contextually by reference to other statutory provisions found in the insurance code. Specifically, Dadeland refers to section 627.756 of the Florida Statutes, which governs attorney fees in any action filed by an owner against a surety under a performance bond issued in conjunction with a construction contract. See § 627.756, Fla. Stat. (1999). Section 627.756 provides that the general provision with regard to attorney fees in prevailing actions against insurers found in section 627.428 also applies to these actions, and that "[o]wners . . . shall be deemed to be insureds or beneficiaries for purposes of this section." § 627.756(1), Fla. Stat. (1999). Dadeland contends that the inclusion of an owner/obligee as an insured in this statutory section reflects the Legislature's intent that obligees are considered "insureds" for purposes of the insurance code as a whole.
In response, St. Paul advances that the inclusion of an owner/obligee within the definition of an "insured" was expressly limited by the Legislature to this attorney fee provision only by the inclusion of the limiting language "for purposes of this section." Therefore, St. Paul contends that Dadeland's position is contrary to the expressed intent of the Legislature to limit this definition of an "insured" solely to section 627.756. Additionally, St. Paul argues that the express inclusion of owners/obligees as insureds for purposes of this section, and the lack of a corresponding provision in section 624.155, demonstrates a legislative intent that the civil remedy statute does not extend to obligees of surety contracts.
We reject the position advanced by St. Paul but conclude that the theory suggested by Dadeland does not automatically answer the question we must resolve. We conclude that the Legislature's intent in enacting section 627.756 was to not only identify obligees as standing in the position of insureds, but to also ensure that principals of payment or performance bonds would not be entitled to recover attorney's fees in actions filed pursuant to those bonds. Consequently, the Legislature's inclusion of an obligee within the definition of "insured" for purposes of section 627.756, although persuasive, is not totally determinative of whether that term should be similarly construed for purposes of section 624.155. Therefore, we must turn to principles of statutory construction to assist in our construction of the use of the term "insured" in section 624.155.
With this foundation in mind, we initially look to the plain and ordinary meaning of the term "insured" in attempting to discern whether the Legislature intended for the term to include the obligee of a surety bond. Words of common usage, when used in a statute, should be construed in the plain and ordinary sense, because it must be assumed that the Legislature knows the plain and ordinary meaning of words used in statutes and that it intended the plain and obvious meaning of the words used. See Mitchell v. State, 911 So.2d 1211, 1214 (Fla.2005) ("If the language of a statute or rule is plain and unambiguous, it must be enforced according to its plain meaning."); Clines v. State, 912 So.2d 550, 555 (Fla.2005) ("We have `repeatedly held that the plain meaning of statutory language is the first consideration of statutory construction.'") (quoting Stoletz v. State, 875 So.2d 572, 575 (Fla. 2004)).
*1226 Insurance has been legislatively defined as "a contract whereby one [the insurer] undertakes to indemnify another [the insured] or pay or allow a specified amount or a determinable benefit upon determinable contingencies." § 624.02, Fla. Stat. (1999). When applying this definition to the relationship created under a surety bond one could conclude that, because a surety is undertaking the responsibility of indemnifying the obligee of a surety bond, an obligee is an "insured" as that term is ordinarily understood in the traditional insurance context. This conclusion is also buttressed by a review of the nature of the surety relationship. In general, suretyship has been described as
a contractual tripartite relationship in which one party (the surety) guarantees to another party (the obligee) that a third party (the principal) will perform a contract in accordance with its terms and conditions. The surety promises the obligee to answer the debt, default, or miscarriage of the principal. Suretyship is a form of guaranty. In exchange for a premium, the surety lends its financial strength and credit to the principal on the condition that, if the surety has to satisfy the principal's debt or default, the principal will indemnify the surety for its losses and expenses. In essence, the surety becomes the guarantor of the principal's ability to perform its obligations to the obligee.
Edward Etcheverry, Rights and Liabilities of Sureties, in Florida Construction Law and Practice at 8-7 (5th ed.2006); see also Roger P. Sauer, Creation of the Relationship, in The Law of Performance Bonds 3 (Lawrence R. Moelmann & John T. Harris eds., 1999) ("A performance bond provides available funds to complete the principal's contract should the latter be in default of the performance it owes the obligee."). Given this description, it is reasonable to conclude that an owner/obligee, by requiring that a bond be obtained by the principal, is essentially insuring itself from potential losses that would result in the event the principal defaults on its obligations required by the underlying construction contract. See Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So.2d 195, 198 (Fla.1992) ("The surety agrees to complete the construction or to pay the obligee the reasonable costs of completion if the [principal] defaults."). This interpretation of the suretyship relationship appears to clearly bring an obligee within the definition of an "insured" as that term is commonly understood. Nevertheless, the surety relationship possesses characteristics that are unique and distinct from the traditional liability insurance relationship and, therefore, our analysis does not end here.
The dissent stresses that a surety's liability is generally limited by the terms of the bond and that this should in some manner favor an interpretation that an obligee should not be considered an "insured" for purposes of section 624.155. We cannot conclude that a limitation of a surety's liability to the penal sum of the bond requires such a conclusion. In our view, this characteristic of the traditional surety relationship is highly analogous to the conventional insurance relationship, since an insurer's liability is also generally limited by the terms of the insurance contract unless, of course, the insurer or surety is shown to have acted in bad faith pursuant to Florida's statutory scheme. In addition, the dissent attempts to emphasize that "[i]n a surety situation, the contract is not called an insurance contract, the contract is called a `bond,'" and that "[t]he words `insurer' or `insured' are not used in the present performance bond and neither are they used in the usual construction surety bond." Dissenting op. at 1244. Contrary to the dissenting opinion, *1227 we conclude that it is an assessment of the actual nature of the surety relationship and its classification in our statutory provision that is required to answer the certified question rather than merely focusing on the labels that may be given in the underlying contract and parties involved in that relationship. It is the substance of this surety relationship that guides our analysis of this certified question, not the labels that may be attached.
We recognize that in Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the Court was asked to determine whether monies withheld from a bankrupt construction company that were paid to the trustee in bankruptcy should be paid to the surety that had made payment to discharge debts of the bankrupt contractor. See id. at 133, 83 S.Ct. 232. In concluding that the surety, having paid the debts of the construction company, was entitled to the money, the High Court noted in dicta that although suretyship and insurance have similar characteristics, "the usual view, grounded in commercial practice, [is] that suretyship is not insurance." Id. at 140 n. 19, 83 S.Ct. 232; see also W. World Ins. Co. v. Travelers Indem. Co., 358 So.2d 602, 604 (Fla. 1st DCA 1978) (noting the distinctions between a general liability insurance policy and a statutory penal bond for purposes of considering indemnification). Notwithstanding these distinctions, the United States District Court for the Southern District of Florida has recognized that "[t]he inclusion of surety and surety insurance in [Florida's] insurance code is strong evidence that Florida intended to hold surety insurers to the same standards as ordinary insurers." Shannon R. Ginn Constr. Co. v. Reliance Ins. Co., 51 F.Supp.2d 1347, 1350 (S.D.Fla.1999). In Shannon R. Ginn, the district court was faced with the issue of whether section 624.155(1)(b)(1) of the Florida Statutes provided a principal in this context a basis to sue a surety for bad faith. See Shannon R. Ginn, 51 F.Supp.2d at 1348. In analyzing this issue, the district court first recognized the distinctions between insurance and suretyship. See id. at 1350. However, the court then held that it is the obligee that looks to the surety for protection from calamity and, correspondingly, it is the obligee to whom the surety owes a duty of good faith, not the principal. See id. 1352. The district court concluded that a claim for a bad faith failure to settle must involve an underlying duty of good faith, and, therefore, a principal is not vested with the right to file a bad faith action pursuant to section 624.155 because it does not qualify as an "insured" under that statute. See id. at 1353. In dicta the district court further reasoned that "if any party has a claim for bad faith failure to settle under section 624.155(1)(b)1, Florida Statutes, it would be the . . . obligee under the performance bond" since it is the surety who owes a duty of good faith to the obligee. Id. at 1352.
Although we conclude that the statutory construction here supports the notion that a statutory bad faith action is available in this context, given that Florida's Insurance Code does not expressly define the term "insured," and that the ordinary meaning of "insured" does not fit neatly into the surety context, our conclusion is further supported upon consideration of how that term has been construed in other jurisdictions under similar scenarios involving bad faith claims against sureties along with subsequent legislative amendments to section 624.155 which enlighten the Legislature's intended meaning of the word "insured" as it is used in section 624.155(1)(b)(1).

Case Law from Other Jurisdictions
In looking to the treatment of this issue in other jurisdictions it is evident that *1228 there is a split of authority as to whether an action is available to an obligee against its surety for bad faith in the claims settlement process. Although somewhat helpful in our analysis, many of the cases discussed below address the existence of a bad faith claim against a surety only in the common law context and are therefore not determinative of the issue in Florida where the Legislature has directly addressed bad faith claims within the insurance code and has expressly created a private statutory cause of action for such claims.
Action Allowed
The Supreme Court of Arizona, in Dodge v. Fidelity & Deposit Co. of Maryland, 161 Ariz. 344, 778 P.2d 1240 (1989), held that the surety on a performance bond could be held liable under the common law for the tort of bad faith failure in investigating a claim on the bond or in failing to remedy the principal's default. See id. at 1241. In reaching its conclusion, the Arizona court noted the legislature's inclusion of suretyship in Arizona's Insurance Code as one of the types of insurance regulated by the Code. See id. at 1241-42. The court also recognized the differences between liability and suretyship, but reasoned that the analysis is not directed to whether there are differences, but rather, whether the Legislature included suretyship among the classes of businesses it intended to regulate under the Insurance Code. See id. at 1242. In Arizona, as in Florida, the legislature has done so. Given this analysis, the court concluded that it was appropriate to extend even the common law action for breach of the duty of good faith that is traditionally recognized in the liability coverage insurer-insured relationship to the relationship between a surety and its obligee. See id. at 1244.
Several other jurisdictions, utilizing comparable analyses, have reached similar resultsholding that the law of the jurisdiction would recognize a common law bad-faith action against a surety. See Loyal Order of Moose, Lodge 1392 v. Int'l Fidelity Ins. Co., 797 P.2d 622 (Alaska 1990) (holding that an implied covenant of good faith exists between a surety and its obligee on performance bonds such as to authorize a common law action in tort by the obligee against the surety for breaching that covenant); Transamerica Premier Ins. v. Brighton Sch. Dist. 27J, 940 P.2d 348 (Colo.1997) (holding that the similarities between the traditional insurance relationship and suretyship, along with the inclusion of the surety business in the insurance statutes allows for a common law cause of action for a surety's failure to act in good faith when processing claims by an obligee pursuant to a performance bond); Int'l Fidelity Ins. Co. v. Delmarva Sys. Corp., No. 99C-10-065WCC, 2001 WL 541469 (Del.Super.Ct. May 9, 2001) (holding that a common law claim sounding in tort for the bad faith breach of a surety contract instituted by an obligee against its surety exists in Delaware due to (1) the relationship between a surety and an obligee being nearly identical to the one between an insurer and an insured; and (2) the inclusion of sureties by the legislature within the insurance statutes); Bd. of Dirs. of the Ass'n of Apartment Owners of Discovery Bay Condo. v. United Pac. Ins. Co., 77 Hawai`i 358, 884 P.2d 1134 (1994) (holding that a surety owes a duty of good faith to both its principal and obligee, and by implication that a common law action for breach of this duty would be available where the surety is found to be liable on the underlying bond); K-W Indus. v. Nat'l Sur. Corp., 231 Mont. 461, 754 P.2d 502 (1988) (holding that a surety on a payment bond is liable at common law in tort to the obligee for bad faith conduct violating the State's Unfair Claims Settlement Practices Act due to the legislature's inclusion of sureties within the general insurance code *1229 which also included the more specific claims practices act even though, unlike Florida, there was no statutory provision creating a private cause of action for violation of the statute); Szarkowski v. Reliance Ins. Co., 404 N.W.2d 502 (N.D.1987) (holding that North Dakota's Unfair Insurance Practices Act applies to sureties issuing performance bonds and that although the practices act did not create a private cause of action for violations of its provisions, unlike Florida, a surety could be held liable under the common law for a cause of action sounding in tort for withholding the payment of a claim in bad faith); Suver v. Pers. Serv. Ins. Co., 11 Ohio St.3d 6, 462 N.E.2d 415 (1984) (recognizing the dissimilarities between suretyship and insurance but holding that a surety has a duty to act in good faith in handling the claims of a third party injured by the principal of a financial responsibility bond and that failure to abide by this duty could result in common law tort liability outside the amount of the bond).
As noted, although very persuasive and helpful in conducting an analysis of the issue presented, none of the cases discussed above are directly applicable in the instant matter due to the common law/statutory distinction. Even though none of the insurance codes in any of the foregoing jurisdictions contained a statutory provision expressly creating a private cause of action for an insurer's bad faith conduct, as does Florida, many relied on similar statutory schemes to support common law actions. However, it is clear that the Legislature in Florida intended to include sureties within the regulatory scheme of Florida's Insurance Code and evidence of such intent, under the reasoning of the courts above, supports a result that would subject sureties to bad faith actions if found to be in violation of the civil remedy provision contained in section 624.155 of the Florida Statutes (1999).
Action Not Allowed
The Supreme Court of California's opinion in Cates Construction, Inc. v. Talbot Partners, 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999), is probably the most often-cited case in which a deciding court has determined that a common law cause of action for bad faith is not available against a surety. The California Supreme Court first noted that California's Unfair Insurance Practices Act did not create a statutory private cause of action against insurers who violate the practices enumerated in the Act, unlike the corresponding Florida practices act. See id. at 417. The court held that a common law cause of action in tort against a surety did not exist under California law and that "recovery for a surety's breach of the implied covenant of good faith and fair dealing is properly limited to those damages within the contemplation of the parties at the time the performance bond is given or at least reasonably foreseeable by them at that time." Id. at 427. Simply stated, only an action on the contract would be recognized. It is clear that although relevant to a discussion of common law actions, Cates is certainly not controlling authority for the issue before us.
Several other states without statutory provisions similar to those in Florida have reached results similar to Catesconcluding that in the absence of a statutory action a private cause of action for bad faith does not exist at common law in the suretyship context. See Cincinnati Ins. Co. v. Centech Bldg. Corp., 286 F. Supp 2d. 669 (M.D.N.C.2003); Superior Precast, Inc. v. Safeco Ins. Co. of Am., 71 F. Supp 2d. 438 (E.D.Pa.1999); Inst. of Mission Helpers v. Reliance Ins. Co., 812 F.Supp. 72 (D.Md.1992); Great Am. Ins. Co. v. Gen. Builders, Inc., 113 Nev. 346, 934 P.2d *1230 257 (1997); Masterclean, Inc. v. Star Ins. Co., 347 S.C. 405, 556 S.E.2d 371 (2001); Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415 (Tex. 1995).

Legislative Amendments to Section 624.155
During the 2005 Legislative Session, the Florida Legislature adopted Senate Bill 652 which became law on June 14, 2005. Section 2 of this bill created subsection (9) of section 624.155 of the Florida Statutes which in its entirety reads:
(9) A surety issuing a payment or performance bond on the construction or maintenance of a building or roadway project is not an insurer for purposes of subsection (1).
Ch.2005-218, § 2, Laws of Fla. This amendment to section 624.155 removes all uncertainty for the future as to whether certain specified surety bonds are subject to its provisions. After the passage of Senate Bill 652, those sureties specifically issuing "payment or performance bond[s] on the construction or maintenance of a building or roadway project" are clearly not considered insurers for purposes of section 624.155 of the Florida Statutes. Ch.2005-218, § 2, Laws of Fla. No other type of surety contract is mentioned.
We have held in the past that when construing a statute, a court "may look to acts passed at subsequent sessions to discern legislative intent." Clair v. Glades County Bd. of Comm'rs, 649 So.2d 224, 227 n. 5 (Fla.1995) (citing Murthy v. N. Sinha Corp., 644 So.2d 983 (Fla.1994); Watson v. Holland, 155 Fla. 342, 20 So.2d 388 (1944)). Further, we have recognized that we have "the right and duty, in arriving at the correct meaning of a prior statute, to consider subsequent legislation." Parker v. State, 406 So.2d 1089, 1092 (Fla.1981) (quoting Gay v. Canada Dry Bottling Co., 59 So.2d 788, 790 (Fla.1952)). However, this tool of statutory construction was called into question somewhat by our opinion in Knowles v. Beverly Enterprises-Florida, Inc., 898 So.2d 1 (Fla.2004). In Knowles, decided not more than two years ago, we were faced with the issue of determining the proper construction of section 400.023 of the Florida Statutes (1997). In construing this statutory section, we refused to consider a legislative amendment passed by the Legislature during the pendency of the case which specifically addressed and cured the controversy at issue; noting that the legislative history was silent as to why the change was made and concluding the "revision to be of no moment with regard to the particular issue in this case." Id. at 6 n. 1. Moreover, we have also been reluctant to look at subsequent amendments to determine legislative intent when the language of a statute is clear and unambiguous, see Savona v. Prudential Ins. Co. of Am., 648 So.2d 705 (Fla.1995), or when an amendment is passed long after the original act was made law as occurred here, see State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55 (Fla.1995). Strict adherence to this latter rule has not been followed, but only when a subsequent amendment is enacted soon after a controversy regarding a statute's interpretation has arisen. See State v. Cotton, 769 So.2d 345 (Fla.2000) (citing Parole Comm'n v. Cooper, 701 So.2d 543 (Fla.1997); Lowry v. Parole & Prob. Comm'n, 473 So.2d 1248, 1250 (Fla. 1985)).
Based on the foregoing, it may be within this Court's discretion to look to the Legislature's recent amendment of section 624.155 to assist in construing the term "insured" but we have most recently refused to do so. We are also mindful that the Legislature's recent amendment to section 624.155 was passed twenty-three years after that statutory section's original *1231 enactment, and some six years after the Southern District's opinion in Shannon R. Ginn, in which the district court indicated concern as to the correct interpretation of the term "insured" as that term is used in section 624.155(1)(b)(1). In addition, Justice Pariente correctly notes in her separate opinion that "the legislative history of this amendment does not explain why section 624.155(9) was added [and a]bsent legislative history confirming or supporting the dissent's conclusion" that the amendment was added to provide the answer to the certified question, such a conclusion is improper. Specially concurring op. at 1238-39 (footnote omitted); see also Knowles, 898 So.2d at 6 n. 1. Nonetheless, we find it helpful to our analysis in this case that the Legislature, when exempting only some surety bonds from the purview of section 624.155 when it amended this statutory section, chose to exempt only certain limited types of bonds from the application of section 624.155. This important fact, which the dissent ignores, suggests that the Legislature intended that other types of suretyship relationships be subject to section 624.155, and indicates that prior to this exemption the suretyship business has been within the purview of the civil remedy provisions of section 624.155.
Based on the foregoing analysis, and our prior cases in which we have noted that the term "insurance" includes a surety, we hold that an obligee is an "insured" for purposes of presenting a cause of action under section 624.155 of the Florida Statutes (1999). Although we recognize the split of authority in other jurisdictions as to whether a common law cause of action should be recognized against a surety for breach of the duty of good faith, we find it compelling that Florida's Legislature has deemed it appropriate to enact a statutory provision in derogation of the common law expressly creating a private cause of action, thus suggesting the Legislature's intent to provide an insured with more protection than was traditionally afforded by the common law. Moreover, as noted in several other jurisdictions, the relationship between a surety and its obligee, although unique, is extremely similar to the relationship between an insurer and its insuredone party, the insured/obligee, is seeking to protect itself against a contingency, and the other party, the insurer/surety, has undertaken to provide certain benefits should that contingency occur. In addition, the recent amendment to section 624.155 buttresses our conclusion that the Legislature originally intended that the suretyship business would be subject to section 624.155. Therefore, we answer the first certified question in the affirmative.[2]
Having answered the first certified question, we now turn to the second question certified by the Eleventh Circuit whether the language in section 624.155 eliminates the requirement of proof of a general business practice when the plaintiff is pursuing a section 626.9541 claim *1232 through the right of action provided in section 624.155. Section 624.155(1) of the Florida Statutes, in its entirety, reads as follows:
(1) Any person may bring a civil action against an insurer when such person is damaged:
(a) By a violation of any of the following provisions by the insurer:
1. Section 626.9541(1)(i), (o), or (x);
2. Section 626.9551;
3. Section 626.9705;
4. Section 626.9706;
5. Section 626.9707; or
6. Section 627.7283.
(b) By the commission of any of the following acts by the insurer:
1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests;
2. Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made; or
3. Except as to liability coverages, failing to promptly settle claims, when the obligation to settle a claim has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.
Notwithstanding the provisions of the above to the contrary, a person pursuing a remedy under this section need not prove that such act was committed or performed with such frequency as to indicate a general business practice.
§ 624.155(1), Fla. Stat. (1999) (emphasis supplied). The circuit court's second certified question implicates the emphasized portion of this statutory provision, and asks whether it eliminates the requirement of proof of a general business practice when the plaintiff is pursuing a section 626.9541 claim through the right of action provided in section 624.155.
St. Paul asserts that the last paragraph of subsection (1) does not apply to actions under subsection (1)(a)(1). In support of its assertion, St. Paul relies on the opinion of the United States District Court for the Middle District of Florida in Ticor Title Insurance Co. v. University Creek, Inc., 767 F.Supp. 1127 (M.D.Fla.1991), as requiring proof of a general business practice in actions based on section 624.155(1)(a). Contrary to St. Paul's assertion, that is not at all what the district court determined in Ticor. In addressing the plaintiff's claims under section 624.155 of the Florida Statutes, the Ticor court explicitly stated that section 624.155(1)(a)(1) "provides a civil remedy for violations of section 626.9541(1)(i) without proof that the insurer committed unfair or deceptive acts with such frequency as to constitute a general business practice." See Ticor, 767 F.Supp. at 1138 (emphasis supplied). Ticor simply does not support St. Paul's position and is, in our view, contrary to St. Paul's analysis.
Turning to the accepted rules of statutory construction, it is clear that the circuit court's question should be answered in the affirmative. Initially, a plain reading of the language of the paragraph in question reveals that it applies to a "person pursuing a remedy under this section." § 624.155, Fla. Stat. (1999) (emphasis supplied). As we noted in Golf Channel v. Jenkins, 752 So.2d 561 (Fla.2000), the Preface to the Florida Statutes explains the hierarchical numbering system of the Florida Statutes and provides guidance as to the structure and nomenclature used therein. See id. at 565. The preface advises *1233 that "each section within a chapter is identified by a whole decimal number consisting of the chapter number followed by digits appearing to the right of the decimal point. For example, `Ds. 16.01' would identify a section in chapter 16 of the Florida Statutes." Linda S. Jessen, Preface to Florida Statutes at vii (2005). With this introduction for uniformity, it is clear to us that the plain language of the paragraph at issue demonstrates that the Legislature intended that it apply to section 624.155 in its entirety, not merely to one subsection which would be identified differently within a "section." If the Legislature had intended for the paragraph at issue to apply solely to subsection (1)(b), it would have indicated this intent by noting that proof of a general business practice was not required for that subsection. See Golf Channel, 752 So.2d at 565. However, section 624.155, as enacted by the Legislature, expressly states that proof of a general business requirement is not necessary for "a person pursuing a remedy under this section" without reference to any particular subsection. § 624.155(1), Fla. Stat. (1999) (emphasis supplied). Moreover, if we were to construe this paragraph as applying only to subsection (1)(b) of section 624.155 and not to subsection (1)(a), it would essentially render the language meaningless, contrary to accepted principles of statutory construction that the Legislature does not intend to enact useless provisions and courts should avoid readings that would render part of a statute meaningless. See State v. Goode, 830 So.2d 817, 824 (Fla.2002). The only other provision referred to in section 624.155 which requires proof of conduct occurring with such frequency as to indicate a general business practice relates to violations of section 626.9541(1)(i), (o), and (x). Therefore, if we were to conclude that the paragraph at issue does not eliminate the requirement of section 626.9541 with regard to a general business practice in actions brought pursuant to section 624.155(1)(a), we would essentially be rendering the language absolutely meaningless as no other provision referred to in section 624.155 requires proof of a general business practice. Based on the foregoing, we answer the second certified question in the affirmative.
The third question certified by the circuit court addresses whether an arbitration panel's finding that the principal on a surety bond has breached its duty to the obligee and that the surety is bound to the extent the principal fails to pay the award satisfies the requirement that there must be a prior adjudication that the obligee is entitled to a payment of a claim from the surety before a section 624.155 action can be instituted. The question certified by the Eleventh Circuit stems from our decision in Blanchard v. State Farm Mutual Automobile Insurance Co., 575 So.2d 1289 (Fla.1991), wherein we held that
an insured's underlying first-party action for insurance benefits against the insurer . . . must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue. It follows that an insured's claim against an uninsured motorist carrier for failing to settle the claim in good faith does not accrue before the conclusion of the underlying litigation for the contractual uninsured motorist insurance benefits.
Id. at 1291. In Blanchard, the plaintiff was injured in an automobile accident by an uninsured motorist. See id. at 1290. Following State Farm's alleged refusal to properly settle Blanchard's claim under his uninsured motorist coverage, Blanchard sued the original tortfeasor for negligence and also sought to compel State Farm to provide benefits under Blanchard's insurance policy. See id. Subsequent to trial, *1234 a verdict was entered in Blanchard's favor awarding him damages, and a judgment was entered against State Farm in the amount of his policy limits. See id. Consequently, Blanchard sued State Farm pursuant to section 624.155 alleging bad faith refusal to settle the uninsured motorist claim. See id. Blanchard's action was dismissed by a federal district court, and appellate review of the dismissal resulted in the Eleventh Circuit certifying a question to this Court. See id. at 1291. In the above-quoted passage, we answered the Eleventh Circuit's question and determined that Blanchard's action had been improperly dismissed by the district court because it had erroneously concluded that Blanchard was required to also prosecute his bad faith claim in the original underlying action. See id.
Our decision in Blanchard was further clarified in Imhof v. Nationwide Mutual Insurance Co., 643 So.2d 617 (Fla.1994). In Imhof, the First District certified the following question to this Court:
IS AN ACTION FOR BAD-FAITH DAMAGES PURSUANT TO SECTION 624.155(1)(B)(1), FLORIDA STATUTES, BARRED BY BLANCHARD v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, 575 So.2d 1289 (Fla.1991), WHERE THE COMPLAINT FAILS TO ALLEGE THAT THERE HAD BEEN A DETERMINATION OF THE EXTENT OF APPELLANT'S DAMAGES AS A RESULT OF THE UNINSURED TORTFEASOR'S NEGLIGENCE?
Id. at 617. We answered the certified question in the affirmative, holding that, although there is no need to allege the specific amount of damages, it is necessary for a plaintiff to allege that a determination has been made with regard to "the existence of liability on the part of the uninsured tortfeasor and the extent of the plaintiff's damages" because absent such a determination "a cause of action cannot exist for a bad faith failure to settle." Id. at 618 (quoting Blanchard, 575 So.2d at 1291). Under the facts of Imhof, we specifically recognized that an arbitration award satisfies this condition precedent to a section 624.155 claim by "show[ing] that [the insured] had a valid claim." Id. at 619.
Based on the foregoing, we conclude that the third certified question should be answered in the affirmative. Initially, similar to the findings of liability on the part of the under-or uninsured motorists in Imhof and Blanchard, the arbitration panel in the instant matter determined that Walbridge was liable to Dadeland for failure to perform its obligations under the construction contract. Additionally, the arbitration panel determined that Dadeland had a valid claim under the performance bond when it held: "The surety is bound to the extent that its principal is obligated under this award." Any assertion on the part of St. Paul that an arbitration award cannot satisfy this condition precedent has already been rejected by our decision in Imhof. Subsequent to Imhof, it is clear that an arbitration award establishing the validity of an insured's claim satisfies the condition precedent set forth in Blanchard. See Imhof, 643 So.2d at 619 ("In the instant case, the arbitration award shows that Imhof had a valid claim."). Therefore, we answer the third certified question in the affirmative and hold that the condition precedent announced by our decision in Blanchard is satisfied when an arbitration panel concludes that a principal has breached its duty to its obligee under a construction contract and that the surety on a bond issued covering the performance of the construction contract is bound to the extent of the principal's liability. The dissenting view is contrary to both Blanchard and Imhof.
*1235 Although based upon our resolution of the third certified question we conclude that the fourth question certified by the Eleventh Circuit is rendered moot, we nevertheless write to address the concerns raised by the dissent with regard to the applicability of res judicata. We have noted that for the doctrine of res judicata to apply, several conditions must exist, which include: "identity of the thing sued for; identity of the cause of action; identity of [the] parties; and identity of the quality in the person for or against whom the claim is made." Albrecht v. State, 444 So.2d 8, 12 (Fla.1984). Res judicata applies to matters actually raised and determined in the original proceeding and also to matters which could have properly been raised and determined. See State v. McBride, 848 So.2d 287, 290 (Fla.2003).
Both parties in this action agree that the required prerequisites for the application of res judicata are not satisfied in the instant case with regard to Dadeland's section 624.155 claim. We also agree. At the time of the arbitration proceeding, Dadeland's section 624.155 claim had not even accrued because there had not been a determination as to whether Walbridge had breached its obligations under the construction contract or whether damages flowing from such breach were covered under the performance bond. See Blanchard, 575 So.2d at 1291 ("[A]n insured's underlying first-party action for insurance benefits against the insurer necessarily must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue."). Moreover, as we approved in Blanchard, a "claim arising from bad faith is grounded upon the legal duty to act in good faith, and is thus separate and independent of the claim arising from the contractual obligation to perform." Id. Based on Blanchard, it is clear that the first two prerequisites for application of res judicataidentity of the thing sued for and identity of the cause of actionare not and cannot be satisfied by the facts of this case. We hold that the arbitration panel's award does not bar Dadeland's bad faith claim against St. Paul and actually it was a condition precedent to this statutory cause of action.
The final question certified to this Court by the Eleventh Circuit asks whether an arbitration panel's denial of a defendant-surety's affirmative defenses in a breach of contract claim collaterally estops the defendant from raising the same defenses in a subsequent bad-faith refusal to settle claim. The essential elements that are required for the application of the doctrine of collateral estoppel were outlined in Department of Health & Rehabilitative Services v. B.J.M., 656 So.2d 906 (Fla.1995). In B.J.M., we held that the essential elements require that "the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction." Id. at 910. We stressed that "collateral estoppel precludes relitigation of issues actually litigated in a prior proceeding." Id. Several courts have appropriately concluded that a determination made during an arbitration proceeding can provide an appropriate foundation for the application of collateral estoppel. See Greenblatt v. Drexel Burnham Lambert, 763 F.2d 1352, 1360 (11th Cir.1985); In re Celotex Corp., 196 B.R. 602 (Bankr. M.D.Fla.1996); In re Hallmark Builders, Inc., 205 B.R. 971, 972-74 (Bankr.M.D.Fla. 1996).
St. Paul concedes that it is collaterally estopped from relitigating defenses that were presented during the prior arbitration and denied by the arbitration panel. However, St. Paul asserts that it should *1236 not be denied the opportunity to demonstrate the factual bases for the affirmative defenses as support for its present defense that it reasonably believed its affirmative defenses in the underlying dispute were valid and, therefore, it was not acting in bad faith in handling Dadeland's bond claim. In response, Dadeland recognizes that St. Paul must be given the opportunity to present a factual basis in support of its assertion that it did not act in bad faith in performing its obligations under the bond. However, Dadeland asserts that this should not result in a reconsideration of defenses that were already litigated and rejected during the previous arbitration proceeding. We agree with both parties. In the instant matter, the essential elements for application of the doctrine of collateral estoppel are present, and, therefore, we answer the fifth certified question in the affirmative.
However, notwithstanding the above, in answering this question we clarify that although St. Paul is precluded from reasserting its affirmative defenses that were previously rejected in the arbitration proceeding, it is not precluded from demonstrating the factual basis for its belief that the rejected defenses were in fact valid when it attempts to prove that it was not acting in bad faith. We have previously stated that the issue of whether an insurer has acted in bad faith should be determined by the application of a totality of the circumstances analysis. See State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 62 (Fla.1995). Therefore, it is necessary for a court faced with a section 624.155 action to consider the entirety of the factual scenario underlying the plaintiff's claim when determining whether the defendant-insurer acted in bad faith and any recoverable damages related to that bad faith. In the instant matter, this factual scenario would necessarily include a review of whether St. Paul reasonably believed that its affirmative defenses were valid, thereby excusing it from performing its obligations under the performance bond. For that reason, it is essential for a court determining the validity of Dadeland's section 624.155 claim to consider whether it was reasonable and in good faith for St. Paul to assert the affirmative defenses prior to the arbitration panel determining that those defenses were not available to St. Paul. Therefore, although we conclude that St. Paul is precluded from relitigating the affirmative defenses previously rejected by the arbitration panel, we hold that St. Paul should not be denied the opportunity to present the factual bases for those affirmative defenses as support for its present defense that it reasonably and in good faith believed that the previously rejected affirmative defenses were valid and that it was therefore not acting in bad faith in response to Dadeland's bond claim.

CONCLUSION
For the foregoing reasons, we answer the first, second, third, and fifth certified questions in the affirmative, and hold that (1) the obligee of a surety contract qualifies as an "insured" and is therefore entitled to sue its surety for bad faith refusal to settle claims pursuant to section 624.155(1)(b)(1) of the Florida Statutes (1999); (2) the language of section 624.155(1)(b)(1) of the Florida Statutes (1999), eliminates the requirement of proof of a general business practice when a plaintiff pursues a section 626.9541 claim through the right of action provided by section 624.155(1)(b)(1); (3) an arbitration panel's findings that a surety's principal has breached its duty to the obligee and that the surety is obligated to the extent that its principal is bound satisfies the condition precedent to a section 624.155 bad faith refusal to settle claim recognized *1237 by our decisions in Blanchard v. State Farm Mutual Automobile Insurance Co., 575 So.2d 1289 (Fla.1991), and Imhof v. Nationwide Mutual Insurance Co., 643 So.2d 617 (Fla.1994); (4) an arbitration panel's findings that a surety's principal has breached its duty to the obligee and that the surety is obligated to the extent that its principal is bound does not bar a later claim against a surety for bad faith refusal to settle under section 624.155 under the doctrine of res judicata; and (5) an arbitration panel's denial of a defendant's affirmative defenses in a breach of contract claim collaterally estops the same defendant from raising those affirmative defenses in a subsequent section 624.155 bad faith refusal to settle claim when the essential elements of collateral estoppel are present. We note, however, that our decision is limited only to answering the questions certified by the Eleventh Circuit and is not intended to address the merits of the claims involved in this matter.
It is so ordered.
ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
PARIENTE, J., specially concurs with an opinion.
WELLS, J., dissents with an opinion, in which BELL, J., concurs.
CANTERO, J., recused.
PARIENTE, J., specially concurring.
I share Justice Wells' concern as to whether a statutory cause of action for bad faith exists under the facts of this case. However, I concur with the majority because I conclude that we have an obligation to answer the legal questions posed by the Eleventh Circuit and because I agree with the majority's resolution of the certified questions.
I write separately to explain why I agree with the majority's resolution of the first certified question and disagree with the dissent's reliance on a subsequent legislative amendment in construing the statute in question. The first certified question asks whether an obligee can be considered an "insured" within the meaning of section 624.155(1)(b)(1), Florida Statutes (2004). This question must be answered by reference to principles of statutory construction.
Because the Legislature does not define the term "insured" within the provisions of the Florida Insurance Code, section 624.155(1)(b)(1) is ambiguous as to whether the term as used therein encompasses an obligee in a suretyship. Section 624.155(1) clearly provides that "[a]ny person may bring a civil action against an insurer when such person is damaged." (Emphasis supplied.) Section 624.155(1)(b), Florida Statutes (2004), states that the insurer's commission of certain enumerated acts will subject the insurer to liability. For purposes of the Florida Insurance Code, the Legislature has defined the term "insurer" to mean "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity." § 624.03, Fla. Stat. (2004) (emphasis supplied).[3] This language expressly includes sureties within the definition of an "insurer" as that term is used throughout the provisions of the Florida Insurance Code.
Reading the definition of "insurer" in section 624.03 together with section *1238 624.155, which subjects an insurer to liability for certain enumerated acts, demonstrates that the Legislature intended for sureties to fall within the ambit of section 624.155. Because section 624.155(1)(b)(1) subjects an insurer to liability for failing to act "fairly and honestly towards its insured and with due regard for her or his interests," the question that arises is whether an obligee or a principal of a performance bond is an "insured" as that term is used in this section.
In Shannon R. Ginn Construction Co. v. Reliance Insurance Co., 51 F.Supp.2d 1347 (S.D.Fla.1999), the court concluded that a principal is not an insured within the meaning of section 624.155 because the surety does not owe a duty to the principal. In a suretyship, the surety owes a duty to the obligee to pay or perform according to the terms of the bond if the principal fails to do so. In effect, the surety insures against or protects the obligee from a determinable contingency: the principal's inability or unwillingness to pay or perform according to the terms of the bond. When the contingency occurs, the surety is directly liable to the obligee for the ensuing damages. This suggests that an obligee should be considered an insured under section 624.155.
Although there are distinct differences between insurance and a suretyship, these distinctions do not require a conclusion that an obligee is not an insured for purposes of section 624.155, especially considering the Legislature clearly intended for a surety to be an insurer within the meaning of the statute. Until the 2005 enactment of section 624.155(9), Florida Statutes, which provides that a "surety issuing a payment or performance bond on the construction or maintenance of a building or roadway project is not an insurer for purposes of subsection (1)," there was no indication, either express or by implication, that the term "insurer" when used in section 624.155 would have a different meaning from that expressly set forth in section 624.03. Thus, it is reasonable to assume that prior to the enactment of section 624.155(9), the Legislature intended for the definition provided in section 624.03 to control.
Concluding that an obligee is not an insured under section 624.155(1)(b)(1) would mean that this provision could never have been applied to a surety despite the fact that a surety is an "insurer" under section 624.03. This interpretation is also inconsistent with section 624.155(1), which allows any person to bring a civil action against an insurer, and section 624.155(1)(b), which states in part that the insurer's commission of any acts enumerated in subsection (1)(b)(1) will subject the insurer to liability under the statute. Accordingly, I join the majority in concluding that an obligee is an insured within the meaning of section 624.155.[4]
The question raised by Justice Wells' dissent is whether, in deciding whether an obligee is an insured under the statute, we should rely on subsequent legislation amending section 624.155. According to the dissent, it is reasonable to assume that section 624.155(9) was added "to provide the answer to this certified question in light of the Eleventh Circuit having certified the question to this Court on September 13, 2004." Dissenting op. at 1241 n. 6. However, the legislative history of this amendment does not explain why section 624.155(9) was added.[5] Absent legislative *1239 history confirming or supporting the dissent's conclusion, the subsequent amendment of section 624.155 is not an appropriate consideration in answering the first certified question. This section could have been added by the Legislature to clarify the Legislature's intent that sureties not be subject to section 624.155, or it could have been added to substantively change the law so that from the effective date of the amendment, sureties are no longer subject to section 624.155. In Knowles v. Beverly Enterprises-Florida, Inc., 898 So.2d 1 (Fla.2004), this Court refused to rely on statutory amendments in interpreting the prior version of the statute because the "changes in [the statute] were substantial and the legislative history is silent as to why the particular change . . . was made." Id. at 5 n. 1. (emphasis supplied). The reasoning of Knowles is applicable to this case.
Further, the enactment of section 624.155(9) occurred twenty-three years after the original enactment of section 624.155, and six years after concern was expressed by the judiciary about the correct interpretation of the term "insured" under section 624.155(1). I do not agree that under these circumstances a subsequent amendment can be construed to "clarify" what a different Legislature enacted many years earlier. Accordingly, I would answer the first certified question in the affirmative in accord with the majority.
I agree with the majority on the answers to the remainder of the questions.
WELLS, J., dissenting.
I dissent because I conclude that the first certified question, if answered, should be answered in the negative. In view of this answer to the first certified question, I would not answer the remaining certified questions. However, since the majority has answered the third question, I will explain why I do not agree with the majority's answer to that question.
Preliminarily, I begin with two facts from the case which are important to my decision in the case. The first is from the arbitration of the dispute by the parties to this case:
By order dated May 15, 2000, the arbitration panel concluded that all parties, including the engineer, the architect, Dade County, [petitioner] Dadeland, and Walbridge were responsible for the deficient construction of the project. The arbitration panel determined that Walbridge owed Dadeland $1,417,842 for its defective work, and that Dadeland owed Walbridge $261,036 for contract balances and additional work performed. See id. In addition, the arbitration panel included the following provision with regard to St. Paul in its award:
[St. Paul] is bound to this award to the extent that [Walbridge] is obligated under the award and its defenses are denied.
Majority op. at 1220. I believe it to be important to recognize that as the "Award of Arbitration" states, the parties "voluntarily participated in this proceeding and submitted themselves to the jurisdiction of the panel."
Further, as noted by Judge Hurley of the United States District Court, Southern District of Florida, in granting defendants' motion for summary judgment, "The panel declared that the award `is in full settlement of all claims and counterclaims submitted to this arbitration.'" Dadeland Station Assocs. Ltd. v. St. Paul Fire & *1240 Marine Ins. Co., No. 01-8287-CIV-HURLEY/LYNCH, order at 10, 2003 WL 21981974 (S.D. Fla. order filed June 13, 2003) (hereinafter Order). Walbridge timely paid the award with interest. Order at 10. In other words, the principal under the performance bond paid to the obligee what was determined in a voluntarily agreed-to arbitration to be owed pursuant to the contract.
Second is the fact of what Dadeland sought as damages in the bad-faith action. In respect to the damages in the bad-faith action, Judge Hurley's order states that "as a result of the defendants' actions, [plaintiffs] sustained damage in having to repair inadequate work performed and having to present their claims to arbitration." Order at 10. The Eleventh Circuit in its opinion certifying the questions to this Court states that in the bad-faith actions, Dadeland alleged that, as a result of the surety's actions, it sustained damages by having to repair inadequate work performed and having to present its claims to arbitration. 383 F.2d at 1375. The majority opinion does not accept these statements by Judge Hurley and the Eleventh Circuit but rather refers to the complaint for bad faith. However, I conclude that this Court, in considering the certified questions, should accept the statements of the trial court and the Eleventh Circuit concerning what damages were sought. This is a case pending in the federal court, to which the Federal Rules of Civil Procedure, including the Federal Summary Judgment Rule, apply. We are not to decide the case; rather, we are only requested to answer the certified question on the basis of what the federal courts present to us as a statement of the case.
The facts are that the arbitration determined the damages for "inadequate work" owed to Dadeland by the surety's principal and that the surety's principal, Walbridge, paid the damages owed to Dadeland for "inadequate work" in full with interest. I believe it can only logically follow that damages for "inadequate work" cannot be the basis for a bad-faith action. The other damage that the trial court and the Eleventh Circuit state was the basis for the bad-faith actions was "having to present their claims to arbitration." I fail to see how this can be a recoverable damage since the arbitration was voluntary. I know of no legal support for such damages. The majority cites to Time Insurance Co. v. Burger, 712 So.2d 389 (Fla. 1998), to support its holding that there could be some kind of damages. But plainly, Time Insurance Co. involved a very different situation involving a health care insurer who failed to authorize treatment by a health care provider.
In sum, I do not understand how this is a "bad faith" claim against the surety, because Dadeland has suffered no cognizable damages for which Dadeland has not been timely paid by the principal of the bond once what was owed was determined by arbitration. Thus there are no damages to be recovered in a bad-faith action against the surety.
To subject a surety to bad-faith damages in a situation in which a solvent contractor-principal pays to an owner-obligee what is fully owed within a reasonable time after the amount owed by the principal is determined in an agreed-to arbitration does not stand the test of either law or logic. The majority's result ignores how practically construction contract surety works. Importantly, a surety has a right to subrogation against the contractor's principal, making it necessary in the workings of the surety-principal-obligee relationship to have determined what the principal owes before the surety makes a payment.
Since there are no cognizable damages which could be the basis for a bad-faith *1241 action in this case, my preference would be to decline to answer the certified questions. Declination is within this Court's discretion. See article V, section 3(b)(6), Florida Constitution, in which this Court is provided discretionary jurisdiction as follows:
(6) May review a question of law certified by the Supreme Court of the United States or a United States Court of Appeals which is determinative of the cause and for which there is no controlling precedent of the supreme court of Florida.
We have previously declined to answer a certified question from the United States Circuit Court which we determined was not determinative of the cause, Greene v. Massey, 384 So.2d 24, 27-28 (Fla.1980), as have courts in other jurisdictions. Palmore v. First Unum, 841 So.2d 233 (Ala. 2002); Eley v. Pizza Hut of Am., Inc., 500 N.W.2d 61 (Iowa 1993); Grant Creek Water Works, Ltd. v. Comm'r of Internal Revenue, 235 Mont. 1, 775 P.2d 684 (1988); Bituminous Cas. Corp. v. Cowen Constr., Inc., 55 P.3d 1030, 1032 n. 3 (Okla.2002); Cray v. Deloitte Haskins & Sells, 925 P.2d 60, 62 (Okla.1996); Jefferson v. Moran, 479 A.2d 734, 737 (R.I.1984); Abrams v. West Va. Racing Comm'n, 164 W.Va. 315, 263 S.E.2d 103, 105 (1980). I do not state this preference out of disrespect for the Eleventh Circuit. I simply believe that we should answer the questions posed in a case in which there are real and cognizable bad-faith damages.
Since the majority has answered question one, I write further to explain my disagreement with the answer.
I do agree with the majority that the answer to this question involves the construction of section 624.155(1)(b)(1), Florida Statutes. I conclude that this construction can be simple and straightforward. The Legislature has recently stated in the statute what it intended to do in respect to these sureties. As the majority states, the 2005 Legislature adopted section 624.155(9), Florida Statutes:
A surety issuing a payment or performance bond on the construction or maintenance of a building or roadway project is not an insurer for purposes of subsection (1).
I would adopt the legislative answer to the certified question and hold that the surety is not an insurer for purposes of section 624.155(1).
We have stated that when scrutinizing the legislative history of a statute to determine legislative intent, courts may look to acts passed at subsequent sessions. See Murthy v. N. Sinha Corp., 644 So.2d 983 (Fla.1994).[6] The majority states that this "tool of statutory construction was called into question somewhat by our opinion in Knowles v. Beverly Enterprises-Florida, Inc., 898 So.2d 1 (Fla.2004)." Majority op. at 1230. However, Knowles was very different from the present case because a majority of the Court in Knowles concluded that the statutory language was clear and unambiguous, and that legislative intent had to be derived from the words used in the statute itself. Id. at 11 (Cantero, J., concurring, with Wells, Anstead, and Bell, JJ., concurring). It is clear from the majority opinion that in the present case the majority does not rest upon the pre-2005 section 624.155(1)(b)(1) being clear and unambiguous. Nor could the majority rest upon the pre-2005 statutory language because the certified question stems from *1242 word "insured" not being used in the statute.
The task that the majority undertakes in answer to the question is to construe the statute to determine who would be considered to be an insured under the statute since the words "insured," "obligee," and "principal" are not used in the statute. We expressly noted the necessity for construction of section 624.155 in State Farm Fire & Casualty Co. v. Zebrowski, 706 So.2d 275, 277 (Fla.1997). In Zebrowski, we considered the meaning of "any person" in the section 624.155(1) language: "Any person may bring a civil action against an insurer when such person is damaged." We held:
While the words "any person" are all-inclusive, it is necessary to consider what those words modify in order to determine the particular persons authorized to pursue the various claims authorized by section 624.155. In subsection (1)(a), there are no specified limitations upon claims for violation of any of the enumerated statutes. However, in subsection (b), the cause of action is predicated on the failure of the insurer to act "fairly and honestly toward its insured and with due regard for his interests." The duty runs only to the insured.
Because there is the need for construction, this is clearly different from Knowles. Since the Legislature has now clarified that a surety is not intended to be an insurer under section 624.155(1), this likewise clarifies that an obligee is not intended to be an insured. It seems only reasonable to me that we accept this clarification. We are dealing with a statutory cause of action, and looking to this timely legislative action is a recognized tool of statutory construction. See Murthy.
But even setting aside the simple answer of the legislative clarification, I still conclude that a contextual construction of the statute results in the statute not creating a bad-faith cause of action against these construction performance sureties. I start from another fundamental rule of statutory construction applied to section 624.155 in Time Insurance Co. v. Burger, 712 So.2d 389, 393 (Fla.1998):
A court will presume that such a statute was not intended to alter the common law other than as clearly and plainly specified in the statute. Ady v. American Honda Finance Corp., 675 So.2d 577 (Fla.1996); Law Offices of Harold Silver, P.A. v. Farmers Bank & Trust Co., 498 So.2d 984 (Fla. 1st DCA 1986) (statute designed to alter the common law must speak in unequivocal terms).
Florida common law did not permit first party claims in which an insured contended that its insurance company was acting in bad faith for refusing to pay for benefits under the policy. Time Ins. Co. v. Burger, 712 So.2d at 391; Baxter v. Royal Indem. Co., 285 So.2d 652 (Fla. 1st DCA 1973). The statute did not plainly alter this rule as to construction performance sureties.
Florida law and the United States Supreme Court have long recognized the difference between insurance such as liability insurance, Zebrowski, health insurance, Time Ins. Co., and a performance bond. The majority opinion at pages 1224-25 refers to the widely accepted statement from Pearlman v. Reliance Insurance Co., 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962):
Among the problems which would be raised by a contrary result would be the unsettling of the usual view, grounded in commercial practice, that suretyship is not insurance. This distinction is discussed in Cushman, Surety Bonds on Public and Private Construction Projects, 46 A.B.A.J. 649, 652-653 (1960).
*1243 In Western World Insurance Co. v. Travelers Indemnity Co., 358 So.2d 602, 604 (Fla. 1st DCA 1978), Judge Ervin wrote:
The distinctions between a general liability insurance policy and a statutory penal bond are obvious. "[T]he usual view, grounded in commercial practice, [is] that suretyship is not insurance." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 236, 9 L.Ed.2d 190 (1962); United States v. Markowitz Bros. Inc., 383 F.2d 595, 599 (9th Cir.1967). The surety on a bond is lending its credit to make certain, if the conditions of the bond are violated, that the aggrieved party will be protected in the event the principal is financially unable to comply with the conditions of the bond. If the principal can satisfy the obligation, the surety need not respond. The surety, unlike the liability insurer, however, is entitled to be indemnified by the one who should have performed the obligation. Cf. Anderson v. Trueman, 100 Fla. 727, 130 So. 12 (1930).
In American Home Assurance Co. v. Larkin General Hospital, Ltd., 593 So.2d 195, 198 (Fla.1992), this Court stated:
The purpose of a performance bond is to guarantee the completion of the contract upon default by the contractor. Florida Bd. of Regents v. Fidelity & Deposit Co., 416 So.2d 30 (Fla. 5th DCA 1982). Ordinarily a performance bond only ensures the completion of the contract. The surety agrees to complete the construction or to pay the obligee the reasonable costs of completion if the contractor defaults. [Ken Sobel, Owner Delay Damages Chargeable to Performance Bond Surety, 21 Cal.W.L.Rev. 128 (1984)] at 137.
The liability of a surety is coextensive with that of the principal. Cone v. Benjamin, 150 Fla. 419, 8 So.2d 476 (1942); National Union Fire Ins. Co. v. Robuck, 203 So.2d 204 (Fla. 1st DCA 1967), cert. denied, 212 So.2d 869 (Fla.1968). However, the surety's liability for damages is limited by the terms of the bond. Cone; Fidelity & Deposit Co. v. Sholtz, 123 Fla. 837, 168 So. 25 (1935). Florida courts have long recognized that the liability of a surety should not be extended by implication beyond the terms of the contract, i.e., the performance bond. State v. Wesley Constr. Co., 316 F.Supp. 490, 497 (S.D.Fla.1970), affirmed, 453 F.2d 1366 (5th Cir.1972); Standard Accident Ins. Co. v. Bear, 134 Fla. 523, 184 So. 97 (1938); Gato v. Warrington, 37 Fla. 542, 19 So. 883 (1896). See also Crabtree [v. Aetna Cas. & Sur. Co., 438 So.2d 102 (Fla. 1st DCA 1983)] at 105 ("[a] surety on a bond does not undertake to do more than that expressed in the bond, and has the right to stand upon the strict terms of the obligation as to his liability thereon").
In David Boland, Inc. v. Trans Coastal Roofing Co., 851 So.2d 724 (Fla.2003), a majority of the Court joined in my view
that the role of such a contract surety is sufficiently distinct from the role of insurers that issue insurance policies so that the attorney fee liability of a construction contract surety needs to be covered by a separate statute. See American Home Assurance Co. v. Larkin General Hospital, Ltd., 593 So.2d 195 (Fla.1992).
David Boland, Inc., 851 So.2d at 727 (Wells, J., concurring, with Anstead, C.J., and Pariente, Cantero, and Bell, JJ., concurring).
The differences between a construction performance surety bond and an insurance policy are many and important. They begin, of course, with the self-evident fact that in an insurance policy there is an insurer (the insurance company) and an insured (the person or entity who has an *1244 insurable interest). In a surety situation, the contract is not called an insurance contract, the contract is called a "bond."
In the present case, the contract is a document from the American Institute of Architects and is titled "Performance Bond." The parties to the contract are the owner (who would be the obligee), the contractor (who is the principal), and the surety. Thus, here, as in the usual construction surety situation, there is an obligee, a principal, and a surety. The words "insurer" or "insured" are not used in the present performance bond and neither are they used in the usual construction surety bondjust as there is no use of the words "insured," "principal," or "obligee" in section 624.155.
As Judge Ervin pointed out in Western World, the surety agrees to stand behind the principal in accord with the terms of the bond if the principal does not perform the construction contract. The reason for the owner to require a surety is to assure the financial responsibility of the contractor so that the construction contract will be performed and the money that the owner is paying the contractor will result in the contracted-for construction. Federal Ins. Co. v. Southwest Fla. Retirement Ctr., Inc., 707 So.2d 1119, 1121 (Fla.1998). Differing from insurance, the amount charged for a bond by a surety (traditionally known as a fee rather than a premium) is based on the financial strength of the contractor rather than an actuarial calculation as is done in determining insurance premiums. As Judge Hurley stated, the dollar amount of the bond is referred to as the penal sum of the bond or bond penalty, and the surety's liability generally is limited to this penal sum. Order at 16.
Nor is it clear who would be the insured if there was considered to be an insured in the performance bond and whether the insured would be the obligee or the principal. The majority notes the substantial split among the various jurisdictions who have decided the issue of whether there is a common law obligation of good faith owed by a surety to a performance bond obligee similar to that owed to an insured under an insurance contract. Contrary to the majority, I believe the sounder view on this issue is with the majority in Cates Construction, Inc. v. Talbot Partners, 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999), not with the dissent in that case, and by the Supreme Court of Texas in Great American Insurance Co. v. North Austin Municipal Utility District No. 1, 908 S.W.2d 415, 418 (Tex.1995).
I find that the tripartite relationship among the obligee, the principal, and the surety prevents either the obligee or the principal from being considered to be an "insured." As the Texas Supreme Court pointed out in Great American, "Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal." Id. at 418-19. If the principal (the contractor) breaches the construction contract, the obligee can sue the principal (contractor) directly for breach of contract. If the obligee does sue the surety, the surety has all the defenses available to the principal (contractor). Further, the surety has a right of subrogation against the principal.
Another distinction from insurance which creates uncertainty as to who would be considered to be the insured is that it is usually the principal who chooses the surety. The amount of the surety's fee is normally passed on to the obligee as part of the contract price, but usually the surety is a surety who regularly provides suretyship to the principal, similar to an insured choosing an insurer from which to *1245 purchase insurance. When a dispute arises between an obligee and a principal, the surety is actually in the middle because if the surety pays the obligee because of that dispute, the surety looks to the principal for reimbursement. In the present case, the principal paid the obligee when the amount owed was determined by the arbitration so that the surety was not in reality involved. To hold that the surety had an obligation to pay before the arbitration determined the amount the principal owed would either deny the principal the right to contest the amount owed through the arbitration or require that the surety pay the amount that the obligee demands (which in this case was at one point $8 million dollars) or be in bad faith. If the surety paid the inflated amount, then the surety would have great risk of not being successful in obtaining reimbursement from a solvent principal. The principal would assert that the surety had been a volunteer.
For all of the foregoing reasons, I would answer the certified question in the negative and in conformity with the Legislature's answer, which is that an obligee is not an insured under section 624.155(1).
Finally, in answer to the third certified question, I believe that Judge Hurley was precisely correct in stating:
Plaintiffs argue that there has, in fact, been a finding of liability against the sureties under the performance bond, and an assessment of damages. Plaintiffs cite the arbitration panel's ruling that "[t]he Surety is bound to this award to the extent that its principal is obligated under the award and its defenses are denied." However, plaintiffs have misinterpreted the panel's decision. The arbitrators' finding that Walbridge was partially liable for breach of the construction contract did not constitute a finding that the sureties had breached their obligations under the separate performance bond. A sensible reading of the decision indicates that the sureties would be liable for the damages assessed against Walbridge only if Walbridge was unable or unwilling to pay the award. But the sureties already owed a contractual duty, under paragraph 6.1 of the performance bond, to correct defective work performed by the contractor in the event of a contractor default. The panel did not impose any liability on the sureties that did not already exist under the terms of the performance bond.
Conceivably, had the arbitration panel ruled that the sureties had breached the contract and were liable for a sum certain, then, and only then, would plaintiffs be able to state a claim for bad-faith claims handling against the sureties. Since there has been no underlying judicial finding that the sureties in-fact failed to perform their obligations under the bond, nor have the sureties tendered payment for a claim or entered into a settlement agreement with the principal or the obligees, plaintiffs cannot demonstrate that the conditions precedent to a bad-faith refusal-to-settle claim have been satisfied.
Order at 19-20. I believe that the majority is incorrect in answering this certified question differently than did Judge Hurley. I also conclude that Judge Hurley was correct in respect to his answer to the issue of res judicata.
BELL, J., concurs.
NOTES
[1] The dissent challenges our reliance upon Time Insurance Co., suggesting that it "involved a very different situation involving a health care insurer who failed to authorize treatment by a health care provider." Dissenting op. at 1240. This is a distinction without a difference. Both Time Insurance Co. and the instant case address bad faith actions against insurance companies, and the same principles with regard to bad faith apply. In Time Insurance Co., the insured claimed that "as a direct result of Time's failure to pay his claims in a timely fashion, he could not obtain needed medical treatment. He also complained of depression and an inability to communicate with his family as a result of his dealings with Time." 712 So.2d at 390. We ultimately held that "section 624.155(1)(b)(1) authorizes the recovery of damages for emotional distress in a first-party bad faith claim against a health insurance company." Id. at 392. Despite the dissent's assertion to the contrary, Dadeland's allegations in its complaint that it suffered damages from "loss of use of monies . . . [and] loss of business opportunities" due to the bad faith of St. Paul are far more tangible than the allegations of intangible damages of emotional distress raised in Time Insurance Co., which were authorized by this Court.
[2] The dissent contends that by answering the first certified question in the affirmative we are "requir[ing] that the surety [either] pay the amount that the obligee demands . . . or be in bad faith." Dissenting op. at 1245. Initially, we note that the dissent's statement drastically oversimplifies the matter. Simply because a surety or an insurance company declines to pay an amount demanded does not automatically result in a finding of bad faith, because the insured must demonstrate at trial that the actions of the surety or insurance company were in fact in bad faith as defined by the relevant statutory provisions. Moreover, to the extent that a surety or insurance company is found to have acted in bad faith, our decision today does nothing more than apply a statute that requires that a surety company's conduct be subject to the same requirements of good faith and fair dealing to which all forms of insurance must conform.
[3] The term "insurance" is defined as a "contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies." § 624.02, Fla. Stat. (2004). A surety contract is considered a type of insurance contract under the Florida Insurance Code. See §§ 627.751-.759, Fla. Stat. (2004).
[4] Of course, this conclusion applies to the interpretation of section 624.155 before the June 14, 2005, effective date of section 624.155(9).
[5] The staff analyses do not discuss the addition of subsection (9) because this provision was added to the Committee Substitute for Senate Bill 652 as a floor amendment after the analyses were prepared. The floor amendment adding subsection (9) was approved without debate.
[6] I believe it reasonable to assume that the statute was amended by the Legislature in 2005 to provide the answer to this certified question in light of the Eleventh Circuit having certified the question to this Court on September 13, 2004.